391 P.2d 919

**Walter C. BUELL, Petitioner,**

**v.**

**SUPERIOR COURT OF MARICOPA COUN-
TY and George M. Sterling, a Judge
thereof, Respondent.**

No. 8320.

Supreme Court of Arizona.

En Banc.

April 29, 1964.

———◇———

William H. Rehnquist, Phoenix, Ron L. Briggs, Casa Grande, and Fred H. Rosenfeld, Phoenix, for petitioner.

James A. Yankee, Phoenix, for respondent.

**64**

BERNSTEIN, Justice.

An investigation of the Arizona Corporation Commission was being conducted by a Committee of the Arizona House of Representatives pursuant to the following resolution:

"RESOLVE that the Committee on Boards and Commissions of the House of Representatives conduct public hearings for the purpose of examining all phases of the existing relationship between Corporation Commission personnel, elective and appointive, and persons and corporations subject to the regulatory jurisdiction of the Corporation Commission; and for the further purpose of examining into existing methods and practices of soliciting employees of the Corporation Commission for political contributions."

As will be set forth in detail in the course of this decision, the Committee heard testimony which indicated that certain payments to Corporation Commissioners or employees of the Commission, had been made through the trust account of A. Michael Bernstein, a Phoenix attorney. The Committee therefore issued a subpoena duces tecum for the records of this account including cancelled checks. Bernstein refused to produce the records and the cancelled checks claiming an attorney-client privilege.

Being advised by its counsel that the attorney-client privilege did not apply, the Arizona House of Representatives adopted Resolutions 16 and 17 on March 12 and 18, 1964, finding Bernstein guilty of contempt. He was taken into custody by petitioner herein, the Sergeant-at-Arms of the Arizona House of Representatives. Application for a writ of habeas corpus was made to the Superior Court of Maricopa County on March 24, 1964. The court held that Bernstein's imprisonment was unlawful, and that he was legally entitled to be discharged.

This is not an appeal from the court's order. Petitioner asks for either a writ of prohibition or of mandamus, directed to the Superior Court. The petitioner states:

"Your Petitioner has no adequate remedy by appeal from the order of the Superior Court, because the power of the Legislature to punish for contempt expires with the adjournment of the session in which the contempt is committed, and it is contemplated that the said Legislature will adjourn on or before April 1, 1964."

Under A.R.S. § 41–1155 the power of the legislature to punish for contempt ends with its adjournment. If this case is to be decided it must be decided immediately. We are of the opinion that the relief requested is more properly granted by a writ of certiorari than by either a writ of

prohibition or a writ of mandamus, and we have considered this petition as if we had before us the issuance of a writ of certiorari, State ex rel. Ronan v. Superior Court, 94 Ariz. 414, 385 P.2d 707; State ex rel. Ronan v. Superior Court, 95 Ariz. 319, 390 P.2d 109. We announced our decision granting certiorari on Friday, March 27 and heard argument on the merits the following Monday, March 30. At that time we announced our decision, and stated that this written opinion would follow.

The sworn report of Committee Chairman Robert Brewer shows that prior to issuance of the subpoena for Bernstein there had been testimony from witnesses indicating that he was an attorney for Earl Alcott, an employee of the Corporation Commission, for G. L. Gibbons, a person having an interest in a business regulated by the Commission, for A. P. "Jack" Buzard, a member of the Commission, and for Frank Sloan, an applicant for a certificate of convenience and necessity pending before the Commission. There was testimony that Sloan had requested an out-of-state investor to put up $25,000 to obtain an interest in the certificate for a helium pipe line for which he was applying, and when the investor's attorney asked how this money would be used, Sloan stated that it would be paid to one or more of the Commissioners. The proposed payments were frequently referred to as "campaign contributions." There was testimony that this payment would be accomplished by a sale of mining claims having only a nominal value, owned by Gibbons, Buzard, and Alcott, to the potential investor for a price of $25,000, and a resale by the investor back to the owners after a time lapse for a price of $1,000. There was further testimony that all payments made to the owners of the mining claims, or made by them, had gone through a trust account in the name of Bernstein. By reason of the foregoing, the records sought pursuant to the subpoena were in the opinion of the Committee, pertinent and material in order to enable the Committee to ascertain whether the mining claims jointly owned by Buzard, Gibbons, and Alcott had been used as a vehicle for disguised bribes to any Corporation Commissioner from or on behalf of a person or corporation subject to the regulatory jurisdiction of the Commission. We have examined the record, and it supports the Chairman's report.

Bernstein appeared before the Committee on March 6, 1964, and made his claim of privilege, as follows:

"Mr. Chairman, I received the suppoena duces tecum yesterday afternoon while I was in court. As I understand the subpoena it is in two parts, the first of which if I really understand it —it's not as clear as I would like to have it—it provides that I should bring all records of my trustee account. The records of my trustee account nec-

essarily involve the business of my clients and the relationship between myself and my clients, and being an attorney and having this attorney-client relationship I have a duty not to divulge the information that I have in this regard. This attorney-client relationship places upon me the duty not to divulge it. As a result I have not brought those records. I felt duty bound not to do so."

Bernstein gave no other reason for his refusal to testify or respond to the subpoena. After further discussion, in which it was made clear that Bernstein is the attorney for the parties under investigation, the Chairman overruled the claim of privilege, both with regard to the records called for by subpoena duces tecum, and Bernstein's refusal to answer the questions of Committee counsel. The privilege was specifically claimed for certain checks called for in the subpoena. After the Arizona Statutes (A.R.S. § 41–1154 and § 41–1155) had been read to Bernstein he adhered to his refusal to answer questions and to produce documents, saying:

"Mr. Chairman, I don't feel as though I have any other choice. I have an obligation to my clients and an attorney-client relationship. I don't know how this Committee could request me to do so in violation of the confidence that must necessarily exist between an attorney and client."

■ It is within the powers of legislative committees to conduct investigations such as the one here involved, and to issue subpoenas and to summon witnesses generally and punish them for contempt if they refuse to answer relevant questions or produce records. In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154 (1897); Ex parte Battelle, 207 Cal. 227, 277 P. 725, 65 A.L.R. 1497 (1929). The witness in Chapman was a stockbroker and in Battelle was a corporate officer.

■ The procedure followed by the House is attacked by Bernstein on the theory that the contempt, if any, is a constructive contempt, and he relies upon Battelle, supra, in which that view was taken in a case involving substantially similar facts. Under the Arizona statutes, however, this is a direct contempt, even though committed before a Committee of the House, rather than the House itself. Under A.R.S. § 41–1153, subsec. A a witness that refuses to obey a legislative subpoena may be committed for contempt by a resolution entered on the House Journal. Under A.R.S. § 41–1155, a refusal to obey the subpoena issued by a legislative *committee* constitutes a direct contempt of the legislative body. A.R.S. §§ 41–1151 to 41–1154 dealing with witnesses before the legislature and punishment for contempt were adopted from California. Section 41–1154 makes disobedience to a legislative subpoena a misdemeanor, but these pro-

ceedings are not taken under that section. Section 41–1155 was taken from New York and provides an additional remedy. Under it the legislature itself may imprison a recalcitrant witness before one of its committees until the end of the session. This is the section involved here.

On April 6, 1964, after the argument of the case at bar, the United States Supreme Court held that those charged with contempt do not have a constitutional right to a jury trial. United States v. Barnett, 1963–64 U. S. Supreme Court Bulletin 1261, 1271. Both of the dissenting opinions, moreover, recognized that there is no need for a jury trial where, as here, "the defendant carries the keys to freedom in his willingness to comply with the court's directive", supra 1328, 1353. The principles of this case apply to legislative contempt. Here, the objective of the legislature is to secure information, not to impose a punishment. It may act summarily under § 41–1155 rather than prosecuting a misdemeanor charge in court under § 41–1154.

■ In Battelle the resolution of the senate adjudging the witness in contempt was held to be insufficient in its recitals to satisfy the requirements of the relevant California statutes. In this case House Resolution 16 had attached to it a copy of the Chairman's report summarized above, which was made a part of the resolution. The recitals included therein are sufficient to satisfy all requirements of the Arizona statutes, and House Resolutions 16 and 17 are valid resolutions on their face.

The decisive question here is whether an attorney may refuse to testify before a legislative committee, under circumstances where any other witness might be compelled to testify. We have found no direct authority upon this point, in cases involving testimony before legislative committees, and must rely on the history of the attorney-client privilege and an analysis of the purposes which it is intended to serve.

■ At the Committee hearing the attorney-client privilege was not referred to as a constitutional right, but this claim was made in a letter distributed to members of the House by Bernstein's counsel before they voted on the contempt resolution. In view of the confusion which inevitably attends legislative proceedings, we consider that this is sufficient compliance with the rule that constitutional issues must be raised at the first opportunity. It is not necessary, however, to decide in this case whether the attorney-client privilege is one of the procedural rights included in the general reference to "due process" in the Fourteenth Amendment to the Federal Constitution and in Art. 2, section 4, of the Arizona Constitution, A.R.S. The legislature is not asserting the power to annul, modify or disregard the traditional attorney-client privilege. It merely contends that this

privilege does not apply to the facts in this case.

■ The courts generally have taken the view that while the attorney-client privilege dates from at least the time of Queen Elizabeth, and exists in the absence of any statute, it is a common law right, rather than a constitutional right. People ex rel. Vogelstein v. Warden of County Jail, 150 Misc. 714, 270 N.Y.S. 362 (1934); In re Selser, 15 N.J. 393, 105 A.2d 395 (1954). The Arizona legislature has affirmed the privilege in A.R.S. § 12–2234 and it is embodied in Canon 37 of the Canons of Professional Ethics of the American Bar Association, which governs the conduct of attorneys in this state. It is a privilege of the client, and not of the attorney, and one which the attorney is bound to assert unless authorized to testify by his client or his client's legal representative, Lietz v. Primock, 84 Ariz. 273, 327 P.2d 288, 67 A.L.R.2d 1262 (1958).

The principles of law governing the attorney-client privilege were well stated by Justice Cardozo in Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) where, speaking for a unanimous court, he said:

"* * * [T]here is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told. There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. See, e. g., Reynell v. Sprye, 10 Beav. 51, 54 [50 Eng.Reprint, 501], 11 Beav. 618 [50 Eng.Reprint, 955]; In re Postlewaite [L.R.] 35 Ch.D. 722, 724; cf. Regina v. Bollivant, [1900] 2 Q.B.D. 163, [1901] A.C. 196 [—C.A.]. But this conception of the privilege is without support in later rulings. 'It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.' O'Rourke v. Darbishire, (1920) A.C. 581, 604. To drive the privilege away, there must be 'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.' O'Rourke v. Darbishire, loc. cit., supra, also pp. 614, 622, 631, 633 of [1920] A.C. When that evidence is supplied, the seal of secrecy is broken. See, also: Regina v. Cox [(1884) L.R.], 14 Q.B.D. 153, 157, 161, 175; cf. Bujac v. Wilson, 27 N.M. 112, 196 P. 513; In re Niday, 15 Idaho, 559, 98 P. 845. The judgment of the House of Lords in O'Rourke v. Darbishire has given to the whole subject a definite exposition. Nor does the loss of the

privilege depend upon the showing of a conspiracy, upon proof that client and attorney are involved in equal guilt. The attorney may be innocent, and still the guilty client must let the truth come out. Regina v. Cox [(1884) L.R. 14 Q.B.D. 153], supra; Matthews v. Hoagland, 48 N.J.Eq. 455, 469, 21 A. 1054; State v. Faulkner, 175 Mo. 546, 593, 75 S.W. 116; Standard Fire Ins. Co. v. Smithhart, 183 Ky. 679, 684, 211 S.W. 441, 5 A.L.R. 972; State v. Kidd, 89 Iowa, 54, 56 N.W. 263; cf. Bank of Utica v. Mersereau, 3 Barb. Ch. (N.Y.) 528, 598, 49 Am.Dec. 189; Coveney v. Tannahill, 1 Hill (N.Y.) 33, 41, 37 Am.Dec. 287.

"* * * A privilege surviving until the relation is abused and vanishing when abuse is shown to the satisfaction of the judge has been found to be a workable technique for the protection of the confidences of client and attorney."

■ Applying the principles announced by Justice Cardozo to this case, it appears that the Committee did lay a sufficient founation for demanding the records asked from Bernstein. Before Bernstein was called the Committee had heard testimony from Wickes, Stanton, Bishop and Sloan regarding a proposed $25,000 transaction which might be regarded as a campaign contribution or as a bribe. An examination of the reporter's transcript shows that a prima facie case had been made, and that under the circumstances the attorney-client privilege did not apply. "He must let the truth be told." Bernstein should produce the records called for in the subpoena, and answer all relevant and proper questions of the Committee.

■ It would be improper to begin an investigation by calling an attorney who intended to claim the attorney-client privilege. It is only after serious charges have been made under oath by witnesses that the Legislative Committee regards as responsible, and a prima facie case established, that an attorney may be called upon to give an explanation of his client's affairs, either to a court or to an investigating committee of the legislature. Here participants in the transaction involving the $25,000 had testified as witnesses before the legislative committee called Bernstein. This was proper procedure.

The writ of certiorari is granted, the writ of habeas corpus is directed to be vacated, and Respondent Bernstein is remanded to the custody of the Petitioner.

UDALL, C. J., LOCKWOOD, V. C. J., and STRUCKMEYER and JENNINGS, JJ., concur.