880 P.2d 662

**STATE of Arizona, Appellee,**

v.

**Diane FODOR, Appellant.**

**No. 1 CA–CR 91–1524.**

Court of Appeals of Arizona, Division One, Department C.

Jan. 11, 1994.

Review Denied Sept. 20, 1994.

Grant J. Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Div., and Warren J. Granville, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by James R. Rummage, Deputy Public Defender, Phoenix, for appellant.

## OPINION

TOCI, Presiding Judge.

Diane Fodor ("defendant") appeals from her convictions of two counts of perjury, both class 4 felonies, arising from her testimony before the state grand jury investigating a coverup in the bombing death of reporter Don Bolles. At trial, the state introduced evidence of a wiretapped telephone conversation between defendant and attorney Tom Henze to prove that defendant perjured herself in her grand jury testimony.

We must decide the following issues: (1) whether the attorney-client privilege bars admission of the June 18, 1990, wiretapped telephone conversation between defendant and attorney Henze; (2) whether the trial court erred in denying defendant's motions for judgment of acquittal; (3) whether the trial court erred in failing to make a proper initial determination of materiality; and (4) whether the trial court committed fundamental error in admitting in evidence certain grand jury testimony.

We dispose of the above issues as follows: We hold that Henze's potential ethical conflict arising from his representation of James Robison did not prevent the creation of an attorney-client relationship between defendant and Henze. Thus, the trial court erred in not suppressing the transcript of the wiretapped conversation between defendant and Henze. Because we cannot say that the admission of such evidence was harmless error, we reverse. We further hold that the trial court properly denied defendant's motion for acquittal on Count I, but erred in denying defendant's motion for acquittal on Count II. Additionally, we reject defendant's argument that the trial court erred by failing to make a preliminary finding that the statements were "material." Finally, we find that the trial court properly exercised its discretion in admitting in evidence grand jury testimony.

## I. FACTUAL AND PROCEDURAL HISTORY

Viewed in a light most favorable to sustaining the jury verdicts, *State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert.*

*denied,* —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993), the evidence is as follows.

In October 1989, the state grand jury began the investigation of a conspiracy to obstruct justice in the alleged coverup of the 1976 car bombing of Don Bolles. In the grand jury proceedings, John Harvey Adamson testified that Max Dunlap hired Adamson to plant the bomb and Robison to "push the button." Adamson also testified that Dunlap promised to take care of Adamson and Robison and their families if they did not disclose Dunlap's involvement.

Robison's former girlfriend, Bette Gleason, made several grand jury appearances. On her first appearance, she denied any knowledge of the Bolles bombing or later events. Later, after she became a witness for the state in exchange for a grant of immunity, she testified a second time. She related her knowledge of Robison's involvement in the Bolles bombing and further testified that she had received approximately $500 a month from Robison's former attorney, Dave Derickson. Gleason believed that the money was being supplied by Dunlap as part of his promise to care for Robison's family while Robison was in prison.

According to the state's evidence at trial, Gleason told special agent George Weisz of the Arizona Attorney General's Office that she had written a letter to Robison shortly after her first grand jury appearance. Although Gleason did not keep a copy of the letter, she described its contents to special agent Weisz. According to Gleason's description, the letter was innocuous—it merely stated that Gleason had been called before the grand jury before Christmas 1989, and described the grand jury experience as a "a lot of B.S." Nevertheless, the state thought it was vital for the grand jury to obtain an exact copy of the letter to find out what was

in it and to verify that Gleason was telling the truth.[1]

The state suspected that defendant was involved in the Bolles matter because of her romantic interest in Robison. Defendant had visited Robison in prison every weekend since 1987. She wrote to him frequently, and had been seen calling or visiting the Dunlaps before or after visiting Robison. The state believed that Robison had used his former girlfriend, Gleason, to transmit payments to Robison from Dunlap. Because defendant had taken the place of Gleason as Robison's girlfriend, the state thought defendant was a "conduit for information" between Robison and Dunlap.

On June 6, 1990, Judge O'Toole authorized the state to intercept defendant's telephone communications from June 6, 1990, to June 20, 1990. The affidavit in support of the application to wiretap defendant's telephone was submitted by special agent George Weisz of the Arizona Attorney General's Office. The affidavit alleged that probable cause existed to believe that defendant was involved in a conspiracy to obstruct a criminal investigation or prosecution, influencing a witness, receiving a bribe by a witness and illegally conducting an enterprise.

On June 18, 1990, two days before the expiration of the wiretap on defendant's phone, Assistant Attorney General Judson Roberts and special agent Weisz decided to try to initiate some activity on the wiretap. They made an unannounced visit to defendant's home at six o'clock in the evening to question her about payoffs from Dunlap.[2] After the two knocked at the door and identified themselves, defendant came to the door, asked what they wanted, and told them, "I need my attorney." Roberts told her that they wanted to know whether she had received any payments from Dunlap. Defendant said she was "not receiving anything

1. The state's answering brief, citing special agent Weisz's trial testimony, states that, after Gleason's second appearance before the grand jury on May 29, 1989, the grand jury asked to have its term extended in part to retrieve the letter Gleason had written to Robison. The grand jury transcripts themselves reveal, however, that Gleason's second appearance was on June 18, 1990, and that no mention of either the letter or

the grand jury's intent to follow up on it is ever made on that date. In fact, the state does not even inform the grand jury of the existence of the Gleason letter until November 28, 1990.

2. Roberts and Weisz recorded the conversation at the door. The transcript is attached as Appendix A.

from anybody" and again stated she needed her attorney.

While Roberts and Weisz stood outside the door, defendant returned to the phone and told her friend Carol Frank, with whom she had been speaking, that the police were at the door. Defendant then called James Robison's attorney, Tom Henze, but no one answered at Henze's office. When Carol called back, defendant asked her to get Henze's home phone number and tell him to call defendant because two men from the attorney general's office were at defendant's home. A few minutes later, after defendant called directory assistance twice in an attempt to obtain Henze's phone number, Henze phoned defendant.

In the ensuing wiretapped conversation with Henze, defendant explained to Henze that she told Roberts and Weisz that she had to talk to her attorney and that they wanted to know "who my attorney is." Then Henze specifically asked defendant whether she was asking for legal advice. Defendant indicated that she was seeking his advice. Henze told her that she did not have to talk to Roberts and Weisz if she did not want to. Henze also told defendant that she should inform Roberts and Weisz that any future meeting with her could be arranged through Henze.

Then the subject of the conversation between defendant and Henze shifted to the Gleason letter in the possession of defendant. Earlier, in a June 11, 1990 conversation monitored by the state, defendant had informed her cousin, Norma Hubele, about the letter and stated that she was planning to send the letter to Henze. Now, in the June 18, 1990, conversation, Henze asked defendant about the letter. She told him that it was in an envelope "sealed and ready to mail to you." Henze told defendant to put it in her purse and deliver it to his office the next morning. The following day, defendant was seen going to the Luhrs Building, where Henze's office is located.

On October 15, 1990, defendant testified before the state grand jury. When asked whether she had "ever given Tom Henze letters or documents that you or anyone else

wrote to Jim Robison," defendant responded, "No, not that I recall." Later, the prosecutor asked defendant, "Has anybody ever suggested that you give that type of evidence to Tom Henze so that the State couldn't get it?" Defendant answered, "No."

Based on these two questions and answers, the state indicted defendant for two counts of perjury. At trial, the state relied on the June 18, 1990, wiretapped conversation between defendant and Henze to prove that defendant did give the Gleason letter to Henze and that she lied when she stated to the contrary. Defendant moved to suppress the conversation, claiming that it was barred by the attorney-client privilege, was obtained through the use of an illegal wiretap, and should have been minimized.[3] After several days of hearings, the trial court denied defendant's motion to suppress. The court found that no attorney-client relationship existed between defendant and Henze, and that the state had properly minimized the wiretap.

At the close of all the evidence, defendant moved for a judgment of acquittal on both counts. The trial court denied the motion. The jury returned verdicts of guilty on both counts.

The trial court suspended the imposition of sentence and placed defendant on four years of supervised probation. The court also ordered defendant to pay $5,000 in partial reimbursement of legal fees, a $30.00 monthly probation fee, a $200.00 felony penalty assessment, and an $8.00 time payment fee. Additionally, defendant was instructed to complete 120 hours in the Work Order Program and to participate in counseling at the discretion of her probation officer. Defendant filed a timely notice of appeal.

## II. DISCUSSION

### A. Suppression of June 18, 1990, Wiretapped Conversation

#### 1. Existence of Attorney–Client Privilege

Defendant argues that the trial court erred in denying the motion to suppress her inter-

---

**3.** A.R.S. § 13–3010(D)(6) governing ex parte orders for the interception of telephone messages, requires that the wiretap be connected in such a way as to "minimize interception of communications not otherwise subject to interception under this section."

cepted June 18, 1990, telephone conversation with Henze. We agree. The transcript of the conversation and the surrounding circumstances reveal that defendant believed she was consulting Henze in his professional capacity. Consequently, the content of the communication between defendant and Henze is protected by the attorney-client privilege.

■ A trial court's ruling on a motion to suppress will not be overturned absent a clear abuse of discretion. *Atwood*, 171 Ariz. at 667–68, 832 P.2d at 684–85. Although we review the evidence and draw inferences most favorably to supporting the trial court's factual findings, we are not bound by the legal conclusions the trial court applied to those findings. *State v. Garcia*, 162 Ariz. 471, 473, 784 P.2d 297, 299 (App.1989). If a suppression order is based on erroneous factual findings or an incorrect legal standard, it is reversible. *State v. Sinclair*, 159 Ariz. 493, 494, 768 P.2d 655, 656 (App.1988).

We first turn to the general principles that govern the attorney-client privilege. In the criminal context, "unless a client consents, a lawyer may not be required to disclose communications made by the client to the lawyer or advice given to the client in the course of professional employment." *Samaritan Foundation v. Goodfarb*, 176 Ariz. 497, 501, 862 P.2d 870, 874 (1993); *see* A.R.S. § 13–4062(2) (1989). "The privilege is intended to encourage the client in need of legal advice to tell the lawyer the truth." *Id.* Our supreme court further stated, "the privilege is central to the delivery of legal services in this country." *Id.*

■ The test for determining whether a communication is protected by the attorney-client privilege is a subjective one; it focuses primarily on the state of mind of the client. *Alexander v. Superior Court*, 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984); *Foulke v. Knuck*, 162 Ariz. 517, 520, 784 P.2d 723, 726 (App.1989). The trial court must examine the circumstances under which the communication was made. *Alexander*, 141 Ariz. at 162, 685 P.2d at 1314; *Foulke*, 162 Ariz. at 520, 784 P.2d at 726. From those circumstances, the court must decide whether the party consulting the attorney believes that he or she is approaching the attorney in a professional capacity and with the intent of securing legal advice. *Alexander*, 141 Ariz. at 162, 685 P.2d at 1314; *Foulke*, 162 Ariz. at 520, 784 P.2d at 726. The fact that a consultation is relatively brief does not negate the establishment of an attorney-client relationship. *Foulke*, 162 Ariz. at 520, 784 P.2d at 726.

■ Here, the circumstances indicate that defendant believed that she was calling Henze for the purpose of securing legal advice. The transcript of the recording made outside defendant's door by Weisz establishes that defendant twice told Roberts and Weisz that she needed to call her attorney. She then made several phone calls trying to reach Henze. The transcript of the June 18, 1990, wiretapped telephone conversation between Henze and defendant indicates that when Henze called defendant back, she immediately stated:

> They wanna question me. I told 'em I had to talk to my attorney.... And I couldn't get through to you so I called my girlfriend and said just get ahold [sic] of Tom.... [W]hat do I do?

Next, defendant unequivocally states that she is calling Henze for legal advice on what to do about the two men from the attorney general's office standing outside her door:

> D[iane] F[odor]: I told 'em I didn't want to talk to them ...
>
> T[om] H[enze]: You have a right to ...
>
> DF: ... without my attorney.
>
> TH: *You have a right to whoever you want to represent you and you've asked me for legal advise [sic], right?*
>
> DF: *Uh huh.*

(Emphasis added.)

Even after the wiretapped conversation with Henze ended, defendant made it clear to Roberts and Weisz that Henze was her attorney in the matters about which Roberts and Weisz were inquiring. When defendant returned to the door after speaking with Henze, she asked Roberts and Weisz to leave and told them to arrange her interview through Henze. At the same time she also told them that she would do whatever Henze

told her to do. Before leaving, Roberts agreed that the attorney general's office would contact Henze about interviewing defendant.

At the hearing on the motion to suppress, although the trial court found many indications of an attorney-client relationship, it was concerned about Henze's conflict of interest in representing both Robison and defendant:

All right. The question of attorney/client privilege is something fairly difficult. Again, certainly some indicia of attorney/client privilege. Even though Mr. Henze was representing Mr. Robison. At that point, until that's raised, I don't know that that automatically at that point makes a conflict between him representing Diane Fodor and Mr. Robison, I don't know. I mean, it certainly has all the earmarks of talking to an attorney. She says she wants to talk to a lawyer.

The tape is replete with people banging on the door wanting to ask her to produce. She says she wants to talk to her lawyer. She says that's her lawyer. Her lawyer gives her information. I have some problems, that's pretty close. It appears to me to be attorney/client privilege. Whether or not there is an attorney relationship at that point, is obviously what I have to decide. That's a very sensitive issue, as far as I am concerned.

Notwithstanding its finding that the conversation had all the "earmarks" of an attorney-client relationship, the court denied the motion to suppress. The court ruled that Henze's apparent conflict in representing defendant prevented an attorney-client relationship from coming into existence:

I don't think Mr. Henze was acting as Miss Fodor's attorney at this particular point. He was representing, still representing Robison, if I am not mistaken.

We conclude that the trial court was mistaken; a lawyer's potential ethical conflict has nothing to do with whether a client communication with a lawyer is protected by the attorney-client privilege. As we observe above, the purpose of the attorney-client privilege is to encourage full disclosure to a legal adviser by one seeking legal services. For that reason, one who seeks legal advice is entitled to claim the privilege for confidences disclosed during the initial consultation even if the lawyer later declines the representation. Charles W. Wolfram, *Modern Legal Ethics* § 6.3.2, at 251–52 (1986). Thus, even had Henze been disqualified from representing defendant, the privilege would continue, together with Henze's corresponding obligation to assert it. Wolfram, *supra*, § 6.3.4.

■ The state contends that, even if the dialogue between defendant and Henze is privileged, the evidence is still admissible to prove perjury. We reject this argument for several reasons. First, none of the cases cited by the state support the state's position. The state's cases relate to evidence obtained in violation of *Miranda* warnings or from illegal searches. Second, the state's argument is contrary to the purpose of the attorney-client privilege—that of "encouraging clients to divulge matters freely to their lawyers." Wolfram, *supra*, § 6.3.5; *see Samaritan Foundation*, 176 Ariz. at 501, 862 P.2d at 874. If we were to adopt the state's argument, we would effectively abolish the attorney-client privilege.

Furthermore, although it is not necessary for us to determine whether a constitutional violation exists here, we observe that the federal courts have found constitutional implications in some violations of the attorney-client privilege. Thus, when the state "intentionally invades the attorney-client relationship or privileged information resulting from an unintentional intrusion is disclosed and prejudice results," a Sixth Amendment violation occurs. *Bishop v. Rose*, 701 F.2d 1150, 1156 (6th Cir.1983) (habeas corpus relief granted where letter from defendant to his attorney was seized from defendant's cell and used by state to impeach defendant's trial testimony). Prejudice results when evidence obtained in violation of the attorney-client privilege is used against the defendant at trial. *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir.1980). Consequently, the state's argument that a conversation protected by the attorney-client privilege may nevertheless be used to convict a criminal defen-

dant of perjury finds no support in federal law.

## 2. The "Crime–Fraud" Exception to the Attorney–Client Privilege

The state argues that a second ground for upholding the trial court's ruling is the "crime-fraud exception" to the attorney-client privilege. Although the crime-fraud issue was argued by the state below, the trial court did not consider it in making its decision. Nevertheless, because the state has raised the issue, we must also consider whether the trial court's denial of the motion to suppress is supportable on this basis. *See State v. Harris,* 152 Ariz. 150, 151, 730 P.2d 859, 860 (App.1986). We find no basis exists to apply this exception to the attorney-client privilege.

■ The state is correct in stating that the crime-fraud exception to the attorney-client privilege is recognized in Arizona. *Buell v. Superior Court,* 96 Ariz. 62, 68, 391 P.2d 919, 924 (1964); *Pearce v. Stone,* 149 Ariz. 567, 572–73, 720 P.2d 542, 547–48 (App.1986). The state, however, neglects to mention a very important element present in the crime-fraud exception: a *prima facie* showing by the state that the attorney was retained by the client for the express purpose of promoting intended or continuing criminal or fraudulent activity. *United States v. de la Jara,* 973 F.2d 746, 748 (9th Cir.1992); *Buell,* 96 Ariz. at 68, 391 P.2d at 924; *Pearce,* 149 Ariz. at 572–73, 720 P.2d at 547–48;

■ The state focuses on the part of the June 18, 1990, conversation where Henze asks defendant if she has the Gleason letter and then suggests that she drop it by his office the following day. The state contends that this evidence demonstrates that the crime-fraud exception is applicable. We disagree. It was Henze, not defendant, who brought up the subject of the letter. Furthermore, the state's own agent, Weisz, admitted at trial that a prior monitored conversation demonstrated that it was already defendant's intention to give the Gleason letter to Henze. Weisz also testified that defendant had no idea that the state had any

interest in the letter when she spoke to Henze on June 18, 1990. Thus, there was nothing illegal or fraudulent about defendant giving the letter to Henze.

## 3. Harmless Error Analysis

■ The erroneous denial of an objection grounded on the attorney-client privilege, however, does not automatically lead to reversal. Wolfram, *supra,* § 6.3.4.[4] Under the harmless error rule, reversal is warranted only when we cannot say beyond a reasonable doubt that the error in admitting the evidence had no influence on the jury's verdict. *State v. Bible,* 175 Ariz. 549, 590, 858 P.2d 1152, 1193 (1993); *State v. Luque,* 171 Ariz. 198, 200, 829 P.2d 1244, 1246 (App. 1992); *see* Wolfram, *supra,* § 6.3.4.

■ Here, the issue in Count I of the indictment is whether defendant actually remembered giving a letter to Henze. The state relied upon the June 18, 1990, conversation to prove that defendant lied to the grand jury when she said that she could not recall giving a letter to Henze. In fact, the state's theory in its closing argument was that the June 18, 1990, telephone conversation in which defendant said she would deliver the letter to Henze's office *by itself* proved that defendant committed perjury. If the jury believed, as it must have, the state's theory of the case, defendant's conviction is squarely based on a conversation protected by the attorney-client relationship. Under these circumstances, we cannot say beyond a reasonable doubt that the error in admitting the June 18, 1990, wiretapped conversation was harmless.

## B. Denial of Motion for Judgment of Acquittal

Because the state may rely on other evidence to prove the allegations in Count I of the indictment, including the June 11, 1990 wiretapped conversation between defendant and Norma Hubele, we now address the issues that may arise if defendant is tried again.

---

**4.** A different per se rule may apply in a criminal case where the communication takes the form of

a confession. *See People v. Gardner,* 106 Cal. App.3d 882, 165 Cal.Rptr. 415, 419 (1980).

Defendant argues that the trial court erred in denying her motion for a judgment of acquittal because: (1) the state did not present substantial evidence that the testimony referenced in Count I was false, (2) the testimony referenced in Count II was literally true, and (3) the testimony was not material.

Rule 20(a), Arizona Rules of Criminal Procedure, requires the trial court to enter a judgment of acquittal "if there is no substantial evidence to warrant a conviction." *State v. Landrigan*, 176 Ariz. 1, 4, 859 P.2d 111, 114, *cert. denied*, —— U.S. ——, 114 S.Ct. 334, 126 L.Ed.2d 279 (1993). Substantial evidence is evidence that a reasonable juror could accept "as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *Id.* (quoting *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990)). *See State v. Hallman*, 137 Ariz. 31, 38, 668 P.2d 874, 881 (1983). "If reasonable [persons] may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *State v. Tison*, 129 Ariz. 546, 553, 633 P.2d 355, 362 (1981) (quoting *State v. Bearden*, 99 Ariz. 1, 4, 405 P.2d 885, 886 (1965)); *State v. Landrigan*, 176 Ariz. 1, 3, 859 P.2d 111, 114 (1993).

### 1. Count I

Count I of the indictment charged defendant with having committed perjury by answering, "No, not that I recall," in response to the question, "Have you ever given Tom Henze letters or documents that you or anyone else wrote to Jim Robison?" We conclude that the court did not abuse its discretion in denying defendant's motion for acquittal. Reasonable persons could fairly differ as to whether defendant remembered giving letters or documents concerning Robison to Henze.

■■■■ The issue concerning Count I of the indictment is whether defendant actually remembered giving a letter to Henze and thus committed perjury when she answered that she did not remember. *See* A.R.S. § 13–2702(A) (1989) ("[a] person commits perjury by making a false sworn statement in regard to a material issue, believing [the statement] to be false"). A witness who testifies that he does not remember an event can be convicted of perjury if it can be proven beyond a reasonable doubt that he does in fact remember the event. *Matter of Battaglia*, 653 F.2d 419, 421 (9th Cir.1981). In such a case, falsity must be proven by circumstantial evidence. *United States v. Chapin*, 515 F.2d 1274, 1284 (D.C.Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). Thus, in inferring a defendant's state of mind, the jury may consider proof of objective falsity of the statement, the defendant's motive to lie, any reason the defendant has to remember the incident, and other similar facts tending to show that the defendant really knew and remembered the things he claimed not to recall. *See United States v. Ponticelli*, 622 F.2d 985, 989 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980); *United States v. Abrams*, 568 F.2d 411, 419 (5th Cir.), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978) (citation omitted).

Here, even without the June 18, 1990, wiretapped telephone conversation between defendant and Tom Henze, the record contains evidence from which the jury could infer that defendant did remember giving letters or documents concerning Robison to Henze. In a wiretapped telephone conversation that occurred June 11, 1990, defendant told Hubele that she had the Gleason letter and that she was going to give it to Henze. Furthermore, defendant was seen on June 19, 1990, going to Henze's office. Consequently, the court did not abuse its discretion in denying defendant's motion for acquittal on Count I.

### 2. Count II

■■■■ Defendant also claims that the trial court erred in denying a motion for a judgment of acquittal on Count II since defendant's answer was literally true. Count II charged defendant with having committed perjury by answering, "No," in response to the question, "Has anybody ever suggested that you give *that type of evidence* to Tom Henze *so that the State couldn't get it*?" (Emphasis added.) We conclude that because defendant's answer to this question is literally true, and because the question is

similar to the question for which defendant was charged in Count I, the trial court erred in denying defendant's motion for a judgment of acquittal as to this count of the indictment.

▆▆▆ A conviction for perjury requires both that the statement made is actually false and that the defendant knows of its falsity. A.R.S. § 13–2702(A). Thus, whether a defendant believes that an answer is true or false generally turns on the defendant's understanding of the question. *United States v. Lighte,* 782 F.2d 367, 372 (2d Cir.1986). If an answer is literally true, it cannot constitute perjury, even if defendant intended to mislead the questioner at the time defendant made the statement. *Bronston v. United States,* 409 U.S. 352, 362, 93 S.Ct. 595, 602, 34 L.Ed.2d 568 (1973).

Furthermore, "[p]recise questioning is imperative as a predicate for the offense of perjury." *Bronston,* 409 U.S. at 362, 93 S.Ct. at 602. The consequences of imprecision in the language used to question a witness by the examiner "must be laid at the table of the questioner, not the questioned." *United States v. Sainz,* 772 F.2d 559, 564 (9th Cir.1985). "A witness cannot be forced to guess at the meaning of the question to which he must respond upon peril of perjury." *Id.*

▆▆▆ Additionally, any inquiry into an alleged perjurious statement must begin with an evaluation of the context in which the statement was made. *Id.* at 562. This is so because the primary policy consideration that governs the contours of the offense of perjury is " 'that the measures taken against the offense must not be so severe as to discourage witnesses from appearing or testifying.' " *Id.* (quoting *Bronston,* 409 U.S. at 359, 93 S.Ct. at 600). The practice of taking testimony out of context would not advance this policy. Consequently, we must look to the context of defendant's statement to determine whether defendant understood the question as intended by the questioner and whether defendant's answer was knowingly false.

Here, the initial questions asked by the prosecutor are capable of two interpretations. The prosecutor first asked defendant if the Dunlaps had suggested to her that she conceal "anything that might be of evidence *against* Mr. Robison." (Emphasis added.) Several questions later in defendant's cross examination the prosecutor defined evidence as "letters written to or from Jim Robison, his diaries, that type of thing." Then the prosecutor asked a series of questions about whether the Dunlaps or Robison had asked defendant to conceal "that" or "that type of thing." The prosecutor never specified in his later questioning whether the "type" of evidence to which he was referring was "evidence *against* Mr. Robison." (Emphasis added.)

Neither did the prosecutor clarify the ambiguity between "evidence" and "evidence against Mr. Robison," as the cross-examination continued. Several questions later, when defendant herself asked the prosecutor for clarification, the prosecutor again referred to "letters written to or from Jim Robison, his diaries, that type of thing." As in the questioning that immediately preceded these questions, the prosecutor did not indicate whether "that type of thing" was, as he had stated when he first began his examination on this point, limited to "anything that might be evidence *against* Mr. Robison." (Emphasis added.) Then the prosecutor asked the question the answer to which forms the basis for Count II of the indictment: "Has anybody ever suggested that you give *that type of evidence* to Tom Henze so that the State couldn't get it." (Emphasis added.)

It is not clear from the series of questions whether the prosecutor's original definition of "evidence" as being "evidence against Mr. Robison" applies to the question for which defendant was indicted. That is one possible interpretation of the question. In other words, one can argue that only letters written to or from Robison that constituted "evidence against him" were the subject of the prosecutor's question. Because the Gleason letter is not "evidence against Mr. Robison," and the state never contended that it was, defendant's answer to the question could have been literally true.

Apart from the problem with the definition of "that type of evidence," defendant's answer could not serve as the basis for a perjury indictment for another, more significant reason; the answer is a literally true answer to a compound question. The prosecutor's question contains two inquiries. One asked defendant whether anyone had suggested that she give such evidence to Henze; the other asked whether the suggestion was made "so that the State couldn't get it." As the trial court correctly noted, this question was ambiguous and confusing:

> First of all, it seems to me that I think it is confusing as to Count 2 when you talk about evidence, that type of evidence to Tom Henze so that the state couldn't get it. And, in addition to that, I think it's essentially the same statement or answer that's made in Count 1.
>
> . . . .
>
> You're the people asking the questions, and that's a lousy question in my opinion because it's confusing.

Had the question been asked in a criminal prosecution rather than a grand jury proceeding, the question would have been objectionable. *See* 1 Morris K. Udall et al., *Arizona Practice: Law of Evidence* § 33, at 52–53 (3d ed. 1991) (compound question is objectionable because it is likely to invite an ambiguous answer). In the context of a perjury prosecution, a conviction cannot stand if the defendant provides a literally true answer to an inquiry that is ambiguous, such as a compound question that actually presents two distinct alternative questions. *Sainz*, 772 F.2d at 563.

Here, defendant answered no to the compound question, "Has anybody ever suggested that you give that type of evidence to Tom Henze so that the State couldn't get it?" The state concedes that nothing exists in this record that establishes that anyone suggested that defendant give evidence to Henze "so that the state could not get it." The state knew from other wiretapped conversations that defendant had no idea that the state had any interest in the letter. Additionally, *no* evidence exists that the state was even seeking the letter at the time Henze suggested defendant bring it to him. Thus, because the suggestion could not have been made that the Gleason letter be delivered to Henze "so that the State couldn't get it," defendant's negative answer to the question was literally true.

Furthermore, excluding the portion of the question "so the State couldn't get it" results in a question strikingly similar to that which is the subject of Count I (compare "Have you ever given Tom Henze letters or documents that you or anyone else wrote to Jim Robison" with "Has anybody ever suggested that you give that type of evidence to Tom Henze?"). Two perjury counts involving answers to slightly different forms of the same question cannot stand. *State v. LaBarre*, 114 Ariz. 440, 442–43, 561 P.2d 764, 766–67 (App. 1977). Consequently, the trial court abused its discretion in denying defendant's motion for a judgment of acquittal as to Count II.

## C. Materiality

We disagree with defendant's argument that because her statements were not "material," the trial court erred in denying her motion for judgment of acquittal on both counts. Materiality is a necessary element of the offense of perjury. A.R.S. § 13–2702(A); *Franzi v. Superior Court*, 139 Ariz. 556, 560–61, 679 P.2d 1043, 1047–48 (1984). "Material" is defined as "that which could have affected the course or outcome of any proceeding or transaction." A.R.S. § 13–2701(1) (1989); *Franzi*, 139 Ariz. at 561, 679 P.2d at 1048. It is no defense to a perjury prosecution that the defendant mistakenly believed a false statement to be immaterial. A.R.S. § 13–2706(A)(3) (1989).

In the grand jury context, the test for materiality is whether "the false testimony has the natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation." *Franzi*, 139 Ariz. at 561, 679 P.2d at 1048 (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir.1970)); *see also United States v. Martinez*, 855 F.2d 621, 624 (9th Cir.1988). It is not necessary for the state to prove that the grand jury's investigation was actually impeded by the false testimony, just that it

could have been. *Franzi*, 139 Ariz. at 562, 679 P.2d at 1049; *Martinez*, 855 F.2d at 624.

Under the above standards, it does not matter that the Gleason letter did not contain evidence that furthered the grand jury investigation. Taking the state's evidence as true, as the trial court was required to do, *State v. Clifton*, 134 Ariz. 345, 348, 656 P.2d 634, 637 (App.1982), the location of a letter from Gleason to Robison was relevant to the grand jury inquiry. A false answer concerning that issue could have a tendency to influence the grand jury's inquiries. Under these circumstances, the trial court did not err in denying defendant's motion for acquittal on the issue of materiality.

### D. Initial Determination Regarding Materiality

Defendant argues that the trial court erred by failing to make a preliminary finding that the statements were material. She further contends that because materiality is an element of the crime, the standard the trial court should apply in making such a finding is "beyond a reasonable doubt." We are not persuaded. We agree with the state that the trial court, at least implicitly, made a finding that the statements were material when it denied defendant's motion for directed verdict of acquittal on the issue of materiality.

Although materiality is an element of the offense of perjury, and as such, must be found by the jury beyond a reasonable doubt, the trial court's preliminary determination is a legal one that turns on an interpretation of substantive law. *Franzi*, 139 Ariz. at 562, 679 P.2d at 1048; *State v. Jensen*, 153 Ariz. 171, 176, 735 P.2d 781, 786 (1987); *see also* A.R.S. § 13–2701(1). In *Franzi*, the supreme court set forth a two-part procedure to determine the materiality of an allegedly perjurious statement: first, the trial court must make a screening decision whether the statement was material as a matter of law; second, if the trial court finds the statement material, it must submit the issue to the jury for its independent determination of the materiality. *Franzi*, 139 Ariz. at 562, 679 P.2d at 1049; *State v. Spinks*, 156 Ariz. 355, 361, 752 P.2d 8, 14 (App.1987). If

the trial court does not find that the statement is material, the perjury charge will be dismissed. *Franzi*, 139 Ariz. at 562, 679 P.2d at 1049. In either event, the trial court is prohibited from informing the jury of its threshold opinion of materiality. *Spinks*, 156 Ariz. at 361, 752 P.2d at 14.

Although *Franzi* requires that the trial court make an initial determination of materiality, it does not mandate that such determination be an express determination. Thus, when the trial court denied defendant's Rule 20 motion for acquittal (which included an allegation of lack of materiality), the trial court made, at least implicitly, the required threshold determination of materiality. Furthermore, because Arizona law requires that the jury make an independent determination of materiality without being told of the court's earlier ruling on the matter, defendant is assured that materiality is proven beyond a reasonable doubt. *Franzi v. Superior Court*, 139 Ariz. at 562, 679 P.2d at 1048. Here, the trial court submitted the matter to the jury for an independent determination of materiality. Thus, the trial court did not err by failing to make an express preliminary determination of materiality.

### E. Admission of Grand Jury Transcripts

Defendant's final argument is that the trial court committed fundamental error in admitting the grand jury transcripts into evidence in her perjury trial. She argues that this evidence tainted her prosecution by painting very uncomplimentary pictures of the people with whom she associated. She contends that the transcripts' description of investigations into the Bolles murder and coverup was largely irrelevant to the issue of whether she committed perjury. We disagree. A trial court has considerable discretion in determining the relevance and admissibility of evidence, and such discretion will not be disturbed on appeal unless clearly abused. *State v. Hensley*, 142 Ariz. 598, 602, 691 P.2d 689, 693 (1984).

Here, for several reasons, the trial court properly exercised its discretion. First, the transcripts were admitted in evidence without objection from defendant. Second, the

transcripts were not admitted for the truth of their contents, but rather to demonstrate what the grand jury deemed material in order to prove that necessary element of the offense of perjury. *See Spinks,* 156 Ariz. at 359, 752 P.2d at 12. "[T]he best way to know what the grand jury deems material is by reading what it asked about." *United States v. Abrams,* 568 F.2d 411, 421 (5th Cir.1978). Indeed, during trial, defendant sought to preclude the introduction of summaries of the grand jury transcripts, arguing that it was the duty of the jury to review the transcripts themselves to determine whether defendant's statements were material to the grand jury's investigation.

In *Spinks,* 156 Ariz. at 361, 752 P.2d at 14, we recommended that when grand jury transcripts are introduced for this purpose, the trial court should give the jury a cautionary instruction on the limited use of such evidence. No such instruction was given in this case, nor was one requested by defendant. The trial court, however, did indicate to the jury on more than one occasion during trial that it was not trying the Bolles case. The court also told the jury that statements from the grand jury transcripts were not admitted to prove their truth, but rather for the purpose of demonstrating what testimony was presented to the grand jury. Notwithstanding the failure to give a cautionary instruction, we find no error that goes to the " 'foundation of the case or that which takes from the defendant a right essential to his defense, and [an] error of such magnitude that the defendant could not possibly have had a fair trial.' " *State v. Stuard,* 176 Ariz. 589, 863 P.2d 881 (1993) (quoting *State v. Libberton,* 141 Ariz. 132, 138, 685 P.2d 1284, 1290 (1984)). Thus, no basis exists for disturbing the trial court's ruling on this issue.

### III. CONCLUSION

For the above reasons, we hold that the attorney-client privilege barred admission of the June 18, 1990, telephone conversation between defendant and Henze. Because the trial court erred in denying defendant's motion to suppress, and we cannot say the error was harmless, defendant's convictions are reversed. Furthermore, since the testimony for which defendant was charged with perjury in Count II is literally true, and is virtually the same testimony for which defendant was charged with perjury in Count I, the court should have granted defendant's Rule 20(a) motion for judgment of acquittal on Count II.

NOYES and WEISBERG, JJ., concur.

### APPENDIX A

Transcript of recorded conversation of June 18, 1990, between George Weisz, Judson Roberts and defendant, Diane Fodor.

(Knock on door)

(Knock on door)

G[eorge] W[eisz]: Diane? (knocking) Hello, Diane. (knocking on door)

J[udson] R[oberts]: Police officer.

GW: Diane? Hello.

D[iane] F[odor]: Who is it?

JR: Police officers, would you open the door . . .

DF: Pardon me?

JR: Police officers, would you open the door for a minute, please? (Door opens)

JR: Hello.

GW: Hi.

JR: Police officers can we talk to you for a minute, please?

DF: (Unintelligible)

JR: Want us to wait till you get off the phone?

DF: I'll call you back, I had to get dressed. All right, bye.

JR: Thanks, sorry to interrupt your call. Can we go inside or, (unintelligible).

DF: I want to know what you want me for?

JR: Well, we want to talk to you a little bit, we're with the Attorney General's Office.

DF: I want to know what you want to talk to me about. I need my attorney.

JR: What we want to talk to you about is uh, we're aware that Bette Gleason received some payments from Max and Barbara Dunlap some years ago and we know that you're now connected with

Jimmy Robison and we want to know if you're receiving any type of payments?

DF: I'm not receiving anything from anybody.

JR: You aren't?

GW: Have you ever been promised, uh, any payments or any kind of uh ...

DF: Excuse me ...

GW: (Unintelligible)

DF: I think I need to call my attorney.

GW: Who, who is your attorney? If I may ask.

DF: You can ask but I don't think I have to answer it right now, do I? I need to ...

JR: Well.

DF: ... make a phone call first before I can talk to you, okay?

JR: Are you gonna come back out or?

DF: Yeah, I'll come back out.

JR: Oh, okay.

GW: Sure, that's fine.

(PAUSE)

DF: I'm still trying, the line's busy.

GW: Okay.

DF: And I'd like a business card from you.

GW: Sure, I'd be glad to.

(Phone ringing in background)

(Pause)

DF: Hi.

GW & JR: Hi.

DF: Can I have a card from each of you?

GW: Sure.

DF: And um, I really don't want to talk to you gentlemen.

GW: Okay, well ...

DF: So.

GW: ... let me just mention that, you know, and you can think about it but it might be to your advantage to talk to us, particularly about trips that you took down here from Washington to meet with the Dunlaps some years ago, so anything along those lines we would sure like to talk to you about.

DF: Would you call Mr. Tom Henze and arrange anything that you need to talk with him, please?

JR: Sure, we can uh, you know, we can, after we talk to Tom we can either interview you here or talk to you in the Grand Jury, whatever's more convenient for you.

DF: It's um, whatever Tom tells me is what I will do.

JR: Okay.

DF: Okay.

JR: (Unintelligible) especially the area that we're interested in is your, basically your sources of income (Unintelligible) expensive place here.

DF: My sources of income?

JR: Sure.

DF: I work.

JR: What do you do?

DF: Thanks, gentlemen.

GW: Okay. Thank you.