**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Oscar D. SAINZ, Defendant-Appellant.**

**No. 85–1009.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 13, 1985.

Decided Sept. 24, 1985.

Stephen M. McNamee, U.S. Atty., John Leonardo, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

D. Jesse Smith, Tucson, Ariz., for defendant-appellant.

Before TANG and FERGUSON, Circuit Judges, and McNICHOLS,* District Judge.

FERGUSON, Circuit Judge:

The defendant, Oscar Sainz, appeals his conviction on one count of perjury for a statement he made before a federal grand jury. 18 U.S.C. § 1623. The defendant, formerly an employee of the Immigration and Naturalization Service ("INS"), was tried on two counts of perjury for statements he made before the grand jury, was convicted on one count, and was sentenced to a year in prison. On appeal, the defendant raises a number of contentions; we need only reach one of his arguments. We reverse.

I.

At all relevant times alleged in the indictment the defendant was employed as a United States Inspector for the INS near the Mexican border at Nogales, Arizona. As a part of his duties the defendant inspected travelers arriving in the United States by car from Mexico at the Nogales point of entry. It is an INS practice to enter the license plate numbers of all entering automobiles into a computer terminal. The information entered into the computer serves a variety of purposes but, at the point of entry, this information is used to alert the INS inspector on duty that further inquiry is warranted. When the computer has alerted the inspector, he is supposed to follow a procedure whereby the identified car is routed into a secondary lane of traffic for further investigation by

* Honorable Ray McNichols, Senior United States District Judge for the District of Idaho, sitting by designation.

other INS officers. INS standard procedure requires the initial INS inspector to put the driver's papers in a cone which is then placed on top of the car in a location beyond the driver's reach.

On May 15, 1984, the defendant was called before a grand jury which was investigating allegations that the defendant had conspired with others to facilitate the illegal entry of automobiles into the United States. The grand jury eventually indicted the defendant on three counts of perjury before the grand jury and one count of conspiracy. The counts were subsequently severed and the defendant proceeded to trial on two perjury counts. The jury convicted the defendant of one of the two perjury counts. For purposes of our discussion, therefore, we need only discuss the grand jury proceedings as they related to this perjury allegation.

During his grand jury testimony the defendant responded to a series of questions posed by the prosecutor exploring the general nature of the defendant's duties at the Nogales station. The government's perjury theory rested on the fact that on two separate occasions, on September 29, 1982 and on December 7, 1983, automobiles had traveled through the defendant's Nogales lane and the defendant had failed to enter their license plate numbers into the INS computer. In the first instance, the car was diverted into a secondary station and, after being searched, an illegal alien was located in the car's trunk. On the second occasion, two vehicles went through the defendant's post with different results; one entered the United States while the other hastily returned to Mexico after being directed to a secondary station. During the defendant's grand jury questioning the prosecutor never mentioned or inquired into the specifics of either incident. Instead, the prosecutor asked general questions of the defendant regarding the defendant's duties and experiences as an inspector at the Nogales station.

According to the indictment, the following colloquy forms the basis for the defendant's perjury offense:

Q[uestion]: Have you ever failed to follow your agency's procedure in running license plates of cars coming into the United States to determine whether or not they were listed as suspicious narcotics vehicles?

A[nswer by Defendant]: No, sir.

The government contends that this response was perjurious because of the defendant's failure to enter the license plate numbers into the INS computer on the two occasions previously mentioned.

A review of the grand jury transcript reveals that this question was subsequently followed by questions about the entry procedures used by the INS. For example, the prosecutor inquired as follows:

Q: Is it a proper *procedure* for an Immigration officer who is working at the Port of Entry at the primary gate to record the license numbers of every car that comes through in the Immigration computer?

A: Yes.

. . . .

Q: And is that the *procedure* that you *generally* follow?

A: Yes, sir.

Q: Have you ever failed to follow that *procedure?*

A: Well, sometimes, you know, like New Mexico plates won't have a plate in the front and so if I see they are from New Mexico I will try to let them through and catch the car as it's going through, but *normally* I will keep to that procedure.

Q: And are you required to do that for every car[,] record it in the computer?

A: Yes.

. . . .

Q: In the event that an individual comes through and you record the number in the computer and the computer reacts with an alarm, which is the *procedure* to be followed?

A: We get a little pad, we write the number 111, which means hit, put a cone on the car and send it down to secondary.

. . . .

Q: So, the *standard procedure* when you have a hit on your computer, is to place a cone on top of the car, place the documents received from the driver in the cone?

A. Yes, sir.

(Emphasis added).

At the close of the defendant's trial, the prosecutor's closing argument to the jury restated the allegedly perjurious colloquy as follows:

And when the question was put to Mr. Sainz, "Have you ever failed to enter these numbers into the system," and he answered, "No," that was false.

As we explain further below, the prosecutor's recollection in his summation of what transpired at the grand jury hearing is incorrect; the most that can be said for the prosecutor's recharacterization of his question before the grand jury is that it reveals what the prosecutor's question should have been.

## II.

■ On appeal, the defendant challenges the sufficiency of the evidence supporting his perjury conviction and contends that he is entitled to a judgment of acquittal. Citing *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), the defendant argues that the prosecution's grand jury questioning was so ambiguous that it will not sustain a perjury conviction. In reviewing a perjury conviction we apply a de novo standard. *United States v. Cowley,* 720 F.2d 1037, 1040 (9th Cir.1983). Our central task is to determine "whether the jury could conclude 'beyond a reasonable doubt that the defendant understood the question as did the government and that, so understood, the defendant's answer was false.'" *Id.* at 1040 n. 2 (quoting *United States v. Matthews,* 589 F.2d 442 (9th Cir.1978), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979)).

■ Our inquiry into the defendant's allegedly perjurious statement must begin with an appreciation of the context in which the statement was offered. *United States v. Cook,* 497 F.2d 753, 764–65 (9th Cir.1972) (Ely, J., dissenting), *dissenting opinion reinstated on rehearing as majority position in relevant part,* 489 F.2d 286 (9th Cir.1973). The practice of lifting statements uttered by a witness out of context can serve no useful purpose in advancing the truth-seeking role of the perjury statutes. Such a practice not only fails to advance the cause of truth in our judicial system, it undermines the primary policy consideration which has governed the contours of the perjury offense from its inception.

The seminal modern treatment of the history of the offense concludes that one consideration of policy overshadowed all others during the years when perjury first emerged as a common-law offense: "that the measures taken against the offense must not be so severe as to discourage witnesses from appearing or testifying."

*Bronston v. United States,* 409 U.S. 352, 359, 93 S.Ct. 595, 600, 34 L.Ed.2d 568 (1973) (quoting from *Study of Perjury, reprinted in* Report of New York Law Revision Commission, Legis.Doc. No. 60, p. 249 (1935)). Common sense reveals that permitting a perjury conviction to be drawn from statements dislodged from their normal context will chill the willingness of witnesses to engage in discourse under oath. Consequently, we must look to the context of the defendant's statement to determine whether the defendant and his questioner joined issue on a matter of material fact to which the defendant knowingly uttered a false declaration.

During his questioning of the defendant about the INS practice of entering license plate numbers into a computer, the prosecutor rarely descended from the level of generalities. Although they remained on that level, these general questions did take a slow march toward the specific. The pertinent questions uniformly used the term "procedure" to describe the INS practices governing the admission of vehicles into the United States. The term was never defined; the term was used by the ques-

tioner to refer equally to the practice of routing entering traffic as it was to placing a driver's documents in a cone on the top of entering vehicles. Thus, it was unclear whether the term "procedure," as used by the questioner, meant the full complement of duties required of an INS inspector when admitting a vehicle or some subset thereof.

■ The initial use of the word "procedure" forms the basis for the alleged act of perjury. The posited question was: "Have you ever failed to follow your agency's procedure in running license plates of cars coming into the United States to determine whether or not they were listed as suspicious narcotics vehicles"? Leaving for the moment the ambiguity associated with the word "procedure," the question presents two distinct alternative questions within one compound question. First, this general question might elicit whether the defendant always followed the discrete steps necessary to "run" plates through the computer. For example, this question might be probing whether the defendant ever negligently or intentionally input incorrect information into the computer. Alternatively, because the prosecutor had preceded this question with three substantially identical questions as to the defendant's direct or indirect involvement in the importation of controlled substances while on duty, the pertinent question may have been directed at whether the defendant failed to "run" license plates for this specific purpose.[1] The government adduced no evidence at trial to support an inference that the defendant was associated in any way with a scheme to import drugs into this country through his post, and the government's perjury the-

ory on this count does not assume such a burden of proof.[2] Under either of the alternative interpretations of the general question propounded of the defendant, his response was literally true. Under the teachings of *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), a literally true answer, even though unresponsive or "shrewdly calculated to evade," cannot form the predicate for a perjury conviction. *Id.* at 362, 93 S.Ct. at 601. *See United States v. Cowley*, 720 F.2d 1037, 1042 (9th Cir.1983) (applying *Bronston* holding to prosecution under 18 U.S.C. § 1623).

Perhaps in appreciation of the imprecise character of his prior question, the prosecutor later returned to this line of questioning for further amplification. While still not departing from the general level of "procedure" to the specific instances of malfeasance later alleged in the indictment, the questions did place a more precise gloss on the meaning of INS "procedure." Thus when asked if it was a "proper procedure" to enter the license plate numbers of entering cars on the INS computer, the defendant responded in the affirmative. Then asked if this was "the procedure that you *generally* follow," the defendant again responded in the affirmative. Finally, when the defendant was asked, "Have you ever failed to follow that procedure?," he indicated that he "normally" followed the procedure, but not always. Hence, once the line of questioning identified the relevant "procedure" as recording every license number into the computer, the defendant's answer was both literally true and responsive to the question. The prosecutor did not ask any further questions clarifying those occasions, "generally" or specifically,

---

1. The two questions immediately prior to the allegedly perjurious question strongly reinforce this interpretation. These two questions were:

   Q: Has anyone offered you a bribe to assist in the importation of marijuana, cocaine or any other controlled substance?

   A: No, sir.

   Q: Have you ever knowingly, intentionally, allowed a vehicle to enter the United States knowing it contained a controlled substance?

   A: No, sir.

Thus, the immediate context of the allegedly perjurious response suggests that the question was directed to alleged importation of controlled substances specifically, not computer irregularities generally.

2. Of course, the government did assume the burden of proving that the grand jury was investigating allegations of defendant's involvement in illicit activity and the defendant's grand jury statements were material to this investigation.

on which the defendant would not enter license numbers into the computer.

Thereafter, any incipient precision in the use of the word "procedure" was swiftly discarded by the questioning prosecutor. Each additional step in the process of admitting a vehicle was labeled a "procedure." Hence, the word is used alternatively to refer to the entire process and to the individual steps in the admission of a vehicle. Within this context, the government urges that the defendant's denial of failing to follow INS "procedure in running license plates of cars coming into the United States" is perjurious. We cannot agree. *Bronston* teaches that the consequences of imprecision in the language used to question a witness must be laid at the table of the questioner, not the questioned. The "procedure" of "running license plates" can be interpreted to mean the whole range of INS practices in admitting a car, from greeting a car through diversion to a secondary station, or some subset thereof. If the prosecutor wanted to focus solely on whether the defendant always entered the license plate numbers into the computer, he was at liberty to ask this question.

■■■ "Precise questioning is imperative as a predicate for the offense of perjury." *Bronston*, 409 U.S. at 362, 93 S.Ct. at 601. A witness cannot be forced to guess at the meaning of the question to which he must respond upon peril of perjury. When the question presents several questions in the guise of one and the government discerns perjury as to one of the possible interpretations, we think it clear that the government's construction of the relevant question should not only be plausible but consistent with the context of the question. In this case, as soon as the questioner narrowed the focus of his questioning to the information actually sought, whether the defendant "generally" input all license plate numbers, the defendant gave a literally true and responsive answer. In such circumstances, the questioner may not plumb the fruits of his prior ambiguous question through a perjury prosecution. The perjury statute and its goal of truth in

our system of justice is served by fostering truthful answers to precise questions, not by penalizing unresponsive answers to unclear questions. Moreover, "[i]t is no answer to say that here the jury found that [the defendant] intended to mislead his examiner. A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner." *Bronston*, 409 U.S. at 359, 93 S.Ct. at 600.

During the government's summation at trial, the prosecutor paraphrased the allegedly perjurious exchange before the grand jury. According to the prosecutor's final argument to the jury, this exchange went as follows: "And when the question was put to Mr. Sainz, 'Have you ever failed to enter these numbers into the system,' and he answered, 'No,' that was false. And it has been proven to you that is false." This characterization of the grand jury exchange is incongruous with the actual colloquy that took place. For the first time, however, the question posed was direct, succinct, and reasonably specific, even though it covered the entire seven-year period of the defendant's INS employment. As *Bronston* indicates, requiring this level of clarity and specificity is the appropriate remedy for imprecise questioning, not a perjury prosecution. *Bronston*, 409 U.S. at 358–59, 93 S.Ct. at 599–600. The prosecution was capable at trial of formulating a sufficiently clear question for the benefit of the jury. If a precise question was possible, summation was not the time to present it for the first time.

■■ In this case, the defendant's response was literally truthful but apparently unresponsive to the questioning prosecutor's intended meaning. Once the question's ambiguity was narrowed somewhat by further questioning, the defendant gave a literally true and responsive answer consistent with the prosecutor's intended meaning. Rather than constituting an example of the corruption of our system of justice through perjury, this sequence of events shows our system working properly.

Accordingly, viewing the defendant's response within their context, we rule that a jury could not conclude that sufficient evidence was proffered to establish beyond a reasonable doubt that the defendant committed perjury as alleged in Count Three of the indictment. The defendant's conviction on Count Three is therefore REVERSED.