**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

QING CHANG JIANG, aka Frank
Jiang,
            *Defendant-Appellant.*

No. 05-10671

D.C. No.
CR-03-20005-RMW

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
December 5, 2006—San Francisco, California

Filed January 10, 2007
Amended January 25, 2007

Before: Myron H. Bright,* Dorothy W. Nelson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge D.W. Nelson

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

1149

## COUNSEL

Richard B. Mazer and Kari E. Hong, Law Offices of Richard B. Mazer, San Francisco, California, briefed for the appellant. Ms. Hong argued for the appellant.

Hartley M.K. West, Assistant United States Attorney, San Francisco, California, briefed and argued for the appellee.

**ORDER**

The panel opinion filed on January 10, 2007, at slip op. 203, is amended as follows:

On slip Opinion page 212, line 26, add the word "intentionally" after "Jiang".

On slip Opinion page 212, line 27, delete the word "materially".

On slip Opinion page 213, replace lines 1 through 11 (beginning with the sentence, "While the export") with:

"While the export application had not been cancelled, the government necessarily already knew the status of the application, and any reasonable person in Jiang's position would have assumed as much. This casts doubt on the conclusion that Jiang intended to mislead Spelce."

On slip Opinion page 213, line 31, delete the word "materially".

**OPINION**

D.W. NELSON, Senior Circuit Judge:

Qing Chang Jiang ("Jiang"), a Chinese citizen, appeals his conviction for intentionally making a materially false statement to a federal agent in violation of 18 U.S.C. § 1001(a)(2). Jiang argues there was insufficient evidence to prove the elements of the crime beyond a reasonable doubt. We agree and reverse Jiang's conviction.

## I. FACTUAL & PROCEDURAL BACKGROUND

Jiang came to the United States to establish an export business. For several years, Jiang ran a small business out of his

home in Northern California, primarily exporting computers and electronic products to commercial customers located in China. In 2001, Jiang entered into a contract with Hebei Far East ("Hebei"), to ship four custom-made microwave amplifiers to Hebei, which is located in China. After further negotiations, the order was subsequently expanded to nine amplifiers.

On March 10, 2002, Jiang received an import permit for the amplifiers from the Chinese government. On March 28, Jiang contracted with Narda DBS Microwave ("Narda"), a California company, to produce the nine amplifiers, and on March 31, Jiang filed an export application with the U.S. Department of Commerce. The application identified Hebei, a commercial entity, as the end user. The Department of Commerce believed Hebei was at the same location as an entity known to be affiliated with the Chinese military. Skeptical that the amplifiers were going to be exported for commercial purposes, the U.S. Office of Export Enforcement opened a formal investigation into Jiang and the export application.

On May 2, 2002, Jiang called Narda and explained that Hebei had cancelled the order because of a delay in the delivery of the amplifiers. Jiang told Narda that if it could confirm that an export license was not required, he would try to negotiate an amicable solution with Hebei. Jiang provided information to Narda confirming that Hebei was a commercial entity, and Narda, upon investigation, concluded that no license was required. Jiang exported the first four amplifiers to Hebei on May 22, 2002.

A week later, Narda shipped Jiang the remaining five amplifiers, but before Jiang had a chance to export them to Hebei, Hebei informed Jiang that the four initial amplifiers did not meet specifications and that it could not use the amplifiers in the project for which they were ordered. Instead, Hebei told Jiang it could use three of the amplifiers in a different, downgraded project, but that one of the amplifiers would be returned and there was no need to ship the remain-

ing five. On June 5, 2002, Jiang sent a letter to Narda explaining the situation, and on June 12, he shipped six amplifiers back to Narda.

On May 22, 2002, Special Agent Craig Spelce ("Spelce") of the Office of Export Enforcement began investigating Jiang's export license application. Spelce telephoned Jiang on June 19 and asked Jiang to meet with him to discuss the export application. Spelce also requested that Jiang bring with him all documents relevant to the transaction and the application. The interview occurred on June 24, 2002, at which time Jiang provided the requested documents.

What was discussed during the interview, including what exact questions were asked and what exact answers were given, is the primary subject of this appeal. No recording or transcript exists, and other than what Spelce and Jiang could recollect of the conversation, which occurred nearly three years before trial, the only record of the interview is a set of notes that Spelce drafted some time after the day of the interview. According to Spelce, he asked Jiang about the transaction with Hebei, Jiang's business affairs, Hebei's identity, Jiang's knowledge of the Chinese military affiliate, and the status of the deal. Spelce testified that when he asked Jiang about the amplifiers, Jiang told him that he returned "the product" to Narda. Spelce did not ask whether Jiang meant that *all* nine amplifiers had been returned to Narda or whether any of them had been shipped to Hebei pursuant to the contract. Spelce testified, however, that he knew at the time of the interview that nine amplifiers were involved in the transaction. Spelce also did not ask Jiang about any of the documents Jiang brought to the interview (at Spelce's request), nor did he ever ask whether Jiang had shipped any amplifiers to China.

On June 26, 2002, following up on information provided in the interview, Spelce contacted Paul Kahle ("Kahle"), a representative from Narda, and learned that Jiang had returned only

six of the nine amplifiers. Spelce requested that Kahle participate in a recorded phone call with Jiang to solicit information about the location of the remaining three amplifiers. On July 1, 2002, Kahle called Jiang to discuss the order. Jiang informed him of Hebei's reasons for not wanting the six returned amplifiers, and when Kahle asked about the location of the other three, Jiang told him that Hebei was able to put them to use in a downgraded capacity.

Jiang's export application was eventually denied on December 20, 2002. On January 21, 2003, the government indicted Jiang for one count of unlawfully exporting goods under 50 U.S.C. § 1705(b). On November 10, 2004, nearly two years after the first indictment, the government added a second count for intentionally making a materially false statement to a federal agent in violation of 18 U.S.C. § 1001(a)(2). On May 9, 2005, after a bench trial, Jiang was acquitted of count one but convicted of count two. The trial court departed upward from the guidelines range and sentenced Jiang to twelve months and one day in custody. Jiang timely appealed his conviction and his sentence.

## II.   JURISDICTION & STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291 to hear Jiang's direct appeal of his criminal conviction entered in federal district court. Because Jiang was convicted pursuant to a bench trial, we review his sufficiency of the evidence claim de novo. *United States v. Naghani*, 361 F.3d 1255, 1261 (9th Cir. 2004); *United States v. Atkinson*, 990 F.2d 501, 503 (9th Cir. 1993) (en banc). We must reverse Jiang's conviction unless, viewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Naghani*, 361 F.3d at 1261 (emphasis and citation omitted).

## III.   ANALYSIS

[1] The government must prove five elements to obtain a conviction for making a false statement under 18 U.S.C.

§ 1001(a)(2): (1) a statement, (2) falsity, (3) specific intent, (4) materiality, and (5) agency jurisdiction. *United States v. Camper*, 384 F.3d 1073, 1075 (9th Cir. 2004).

**[2]** When determining whether there is sufficient evidence to satisfy these elements, we "must begin with an appreciation of the context in which the statement was offered[, and] . . . we must look to the context of the defendant's statement to determine whether the defendant and his questioner joined issue on a matter of material fact to which the defendant knowingly uttered a false declaration." *United States v. Sainz*, 772 F.2d 559, 562 (9th Cir. 1985). We must also consider "extrinsic evidence relevant to [the defendant's] understanding of the questions posed." *United States v. Culliton*, 328 F.3d 1074, 1079 (9th Cir. 2003) (per curiam). The district court did not sufficiently account for the context in which Jiang's statements were made, nor did it incorporate the numerous extrinsic facts that weigh against a conviction.

**[3]** First, the *only* proof offered by the government that Jiang uttered a false statement is Agent Spelce's testimony, based largely on Spelce's notes, which were recorded some time after the day of the interview. Although there were nine amplifiers in the transaction, split into various shipments, Spelce testified that Jiang stated "he returned *the product* back to the manufacturer, Narda." Spelce's interview notes also indicate Jiang "stated that he bought *the microwave amplifier* directly from Narda" and that he "had Narda ship *the product* directly" to Jiang. (emphases added) Furthermore, Spelce admitted he could not recall whether he used the singular form (i.e., "amplifier") or the plural form (i.e., "amplifiers") when questioning Jiang. The distinction is significant because two-thirds of the amplifiers were, as Jiang correctly stated, returned to Narda. Therefore, Jiang could have understood Spelce to be referring to the second, larger shipment of amplifiers—not the entire lot.

**[4]** Second, Spelce stated that during the interview he knew there were multiple amplifiers involved in the transaction, yet

his notes are inconsistent with that testimony. Spelce failed to indicate even once in his notes that more than a single amplifier or a single shipment was involved. Nor did Spelce ever ask Jiang whether he returned *all* the amplifiers to Narda, which would have been the obvious and logical follow-up question if Spelce knew there were multiple amplifiers and shipments involved in the transaction.

It is particularly troubling that Spelce never asked whether Jiang had shipped any of the amplifiers to China. Spelce did not attempt to solicit this answer until July 1, 2002, when Kahle asked the question, at Spelce's direction. Notably, when asked the question directly, Jiang did not hesitate in saying that he had shipped three of the amplifiers to China.

**[5]** Third, Spelce requested that Jiang bring documents to the interview regarding the sale and shipment of the amplifiers, and Jiang complied. Those documents clearly indicated that Jiang contracted to ship a total of nine amplifiers to his Chinese client, four of which were to be shipped by April 30, 2002, and that six of the nine were returned to Narda on June 12, 2002. Had Spelce examined the documents Jiang provided, Spelce might have asked whether the April 30 deadline had been met, or what had happened to the other three amplifiers that were not returned. Unfortunately, Spelce did not review the documents during the interview, nor did he question Jiang about them. That Jiang provided the documents willingly, and that they indicate three of the amplifiers were not returned, is yet another reason the context indicates that Jiang did not intend to mislead Spelce.

**[6]** Fourth, we cannot properly evaluate Jiang's statements without considering the language barrier that existed between Spelce and Jiang. Spelce characterized Jiang's English as "broken" and "poor," and two other U.S. officers who interviewed Jiang both testified that his command of English was limited. Similarly, the transcript of the phone call between Kahle and Jiang (the only record of Jiang's command of

English near the time of the interview) reveals that his English was limited—certainly enough so to doubt whether he and Spelce had a common understanding of the grammatical fine points of the questions that were asked and the answers that were given, such as the use of the singular or the plural form. Had Spelce been genuinely concerned about confirming his understanding of Jiang's statement, rewording the questions, or asking the obvious and logical follow-up questions (discussed *supra*), would have gone far toward resolving the ambiguity that pervades the evidence behind Jiang's conviction.

[7] Fifth, the factual findings of the district court are insufficient to sustain a conviction. The court found that Jiang told Spelce "that the export application had been cancelled and that the product was returned to Narda." These findings fall far short of proving beyond a reasonable doubt that Jiang intentionally uttered a false statement. Although the trial court found Spelce's testimony credible, the government cannot sustain a materially false statement charge based merely on the government agent's interpretation of what the individual meant—there must be clear evidence of what was said and a full appreciation of the context in which the statement was made.

[8] Moreover, as already explained, the documents Jiang provided to Spelce indicated that some of the amplifiers had been returned while others had not. While the export application had not been cancelled, the government necessarily already knew the status of the application, and any reasonable person in Jiang's position would have assumed as much. This casts doubt on the conclusion that Jiang intended to mislead Spelce.

[9] Finally, the record reflects that the exchange was, at best, ambiguous. The context of the question and other extrinsic evidence make it impossible to "conclude beyond a reasonable doubt that the defendant understood the question as

did the government and that, so understood, the defendant's answer was false." *Sainz*, 772 F.2d at 562 (internal quotation marks omitted). Moreover, "the consequences of imprecision in the language used to question a witness must be laid at the table of the questioner, not the questioned." *Id.* at 564. It does not escape our attention that the ambiguity could have been resolved easily had Spelce simply asked whether any of the amplifiers had been shipped to China. In this vein, requiring agents to use a minimum "level of clarity and specificity is the appropriate remedy for imprecise questioning, not a [criminal] prosecution." *Id.*

## IV.   CONCLUSION

**[10]** In sum, in light of the extrinsic evidence and the context in which Jiang's statements were made, there is insufficient basis upon which to conclude beyond a reasonable doubt that Jiang intentionally made a false statement. Accordingly, we reverse his conviction.

Jiang also argues that his conviction violated due process, and he appeals his sentence as unreasonable in violation of 18 U.S.C. § 3553. Because we reverse Jiang's conviction on insufficient evidence grounds, we need not reach his due process or sentencing arguments.

**REVERSED**.