# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 23, 2020        Decided July 6, 2021

No. 19-3079

UNITED STATES OF AMERICA,
APPELLEE

v.

AZAM DOOST, ALSO KNOWN AS ADAM DOOST, ALSO KNOWN
AS MOHAMMAD AZAM DOOST, ALSO KNOWN AS MOHAMMAD
AZIM,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cr-00109-1)

---

*Aaron Schwartz* argued the cause for appellant. With him on the brief were *Glenn Seiden* and *Brooke L. Stevens*.

*Scott A.C. Meisler*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for appellee. With him on the brief were *Michael P. McCarthy*, Trial Attorney, and *Brian C. Rabbitt*, Acting Assistant Attorney General. *Jeremy R. Sanders*, Attorney, entered an appearance.

Before: ROGERS, KATSAS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: A jury convicted Azam Doost for his involvement in a scheme to defraud the Overseas Private Investment Corporation, a government agency. He now appeals his convictions for major fraud against the United States, wire fraud, false statements, and money laundering. He principally argues that he received ineffective assistance of counsel because his lawyer failed to argue that some counts of the indictment were multiplicitous, time-barred, or both, and also because counsel failed to admit certain exculpatory evidence at trial. Because Doost fails to demonstrate that counsel provided ineffective assistance, we affirm his convictions.

I.

Doost and his brother owned a company in the United Arab Emirates called Equity Capital Group. A subsidiary of the company, Equity Capital Mining (the "Mine"), secured a ten-year lease on a marble mine in Afghanistan. To finance the mining operations, Doost executed a loan agreement between the Mine and the Overseas Private Investment Corporation ("OPIC"). At the time, OPIC was a federal agency that supported "investments by the United States government in emerging markets worldwide to foster the development and growth of free markets." App. 3.[1] OPIC loaned the Mine $15.8 million for its development, maintenance, and operating expenses. The loan agreement made Doost personally responsible for a matching capital contribution. The agreement

---

[1] In 2018, after the events relevant to this case had transpired, OPIC's functions were transferred to the United States International Development Finance Corporation. *See* Better Utilization of Investments Leading to Development Act of 2018, §§ 1464, 1470(a), Pub. L. No. 115-254 Div. F, 132 Stat. 3186, 3513, 3515–16.

also required Doost to disclose all transactions between the Mine and certain parties closely affiliated with the Mine, including Doost and his brother. Pursuant to the loan agreement, Doost submitted three disbursement requests to OPIC—in the amount of $7 million on April 18, 2010, $7 million on July 15, 2010, and $1.8 million on November 28, 2010.

Doost's scheme to defraud OPIC proceeded through two avenues. First, he failed to disclose to OPIC even a single affiliated transaction—when there were actually many affiliated transactions that enriched Doost, his brother, and other relatives with the Mine's OPIC-backed money. Second, he submitted invoices to OPIC for equipment purchases that were false or contained false information. For example, Doost sought reimbursement for sham purchases, overbilled for actual purchases, and double-billed OPIC for expenditures already reimbursed by another funding source. The OPIC loan eventually went into default after the Mine made no principal payments and failed to pay nearly $2 million in accrued interest.

The government returned a 23-count indictment against Doost, alleging major fraud against the United States, wire fraud, false statements, and money laundering. The jury convicted Doost on twenty counts.[2] The district court sentenced him to fifty-four months of incarceration, followed by thirty-six months of supervised release, and ordered him to make restitution of $8,940,742 to the United States.

Doost then filed a combined motion under Rules 29 and 33 of the Federal Rules of Criminal Procedure for judgment of acquittal and for a new trial, claiming that trial counsel was ineffective by failing to object to certain counts of the indictment as time-barred, multiplicitous, or both, and also by

---

[2] Doost was acquitted on three of eight counts of money laundering.

failing to admit certain evidence at trial that would have been favorable to Doost, including calling certain witnesses. The district court denied Doost's motion. It held that Doost was not prejudiced by any of counsel's decisions not to introduce additional evidence because ample evidence would still have supported his conviction. *United States v. Doost*, 2019 WL 1560114, at \*4–7 (D.D.C. Apr. 10, 2019). The district court also held that Doost was not prejudiced by counsel's failure to object to the indictment as multiplicitous because it was not multiplicitous, so such an objection would have been unavailing. *Id.* at \*8–10.

Lastly, with respect to the timeliness of the indictment, the district court held that although all but two counts of the indictment were untimely on their face, the Wartime Suspension of Limitations Act ("WSLA") tolled the limitations period for the challenged major fraud count. *See* Act of June 25, 1948, Pub. L. No. 80-772, § 3287, 62 Stat. 683, 828 (codified as amended at 18 U.S.C. § 3287). When the United States is engaged in foreign hostilities, the WSLA tolls the limitations period under three circumstances: for crimes (1) "involving … fraud against the United States," (2) "committed in connection with the … handling … of any real or personal property of the United States," or (3) "committed in connection with" contracts that are in turn "connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces." 18 U.S.C. § 3287.

Because the WSLA tolled certain counts of the indictment and the jury could reasonably have found that it tolled the rest, the district court determined that Doost could not show prejudice from counsel's failure to challenge the indictment as untimely, so there was no ineffective assistance of counsel. *See Doost*, 2019 WL 1560114, at \*11–14; *United States v. Doost*, 2019 WL 3344277 (D.D.C. July 24, 2019). Doost timely appealed.

5

II.

The Sixth Amendment provides a criminal defendant with the right "to have the Assistance of Counsel for his defence," U.S. CONST. amend. VI, which the Supreme Court has held encompasses the right to effective assistance of counsel, *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, the defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced him. *Id.* at 687.

With respect to deficient performance, we assess whether counsel's performance "fell below an objective standard of reasonableness," while "indulg[ing] a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 688, 689. With respect to prejudice, we consider whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. To meet this standard, the defendant need demonstrate only a "'probability sufficient to undermine confidence' in the verdict." *United States v. Nwoye*, 824 F.3d 1129, 1135 (D.C. Cir. 2016) (quoting *Strickland*, 466 U.S. at 694). The defendant bears the burden of demonstrating both elements of ineffective assistance under the *Strickland* standard. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017).

We review the district court's rulings on ineffective assistance claims de novo. *United States v. Vyner*, 846 F.3d 1224, 1227 (D.C. Cir. 2017).

A.

Doost asserts that counsel performed deficiently by not challenging the indictment as multiplicitous. We conclude that the counts were not multiplicitous, so Doost has failed to demonstrate ineffective assistance because "[t]he failure to

raise a meritless objection is not deficient performance." *United States v. Islam*, 932 F.3d 957, 964 (D.C. Cir. 2019).

A multiplicitous indictment charges the same crime in multiple counts, which violates the Fifth Amendment's prohibition against double jeopardy. U.S. CONST. amend. V. "The Fifth Amendment … protects not only against a second trial for the same offense, but also against multiple punishments for the same offense." *Whalen v. United States*, 445 U.S. 684, 688 (1980) (cleaned up). Multiplicity is an indictment defect that the defendant must challenge before trial. *See* FED. R. CRIM P. 12(b)(3)(B)(ii); *United States v. Burroughs*, 810 F.3d 833, 837 (D.C. Cir. 2016). Doost made no such pretrial motion here. Rule 12 excuses untimely indictment challenges, however, "if the party shows good cause." FED. R. CRIM. P. 12(c)(3). "Good cause" includes ineffective assistance of counsel. *See United States v. Weathers* ("*Weathers I*"), 186 F.3d 948, 952–53, 958–59 (D.C. Cir. 1999) (identifying ineffectiveness as a "cause" for a forgone multiplicity challenge).

Doost claims the indictment suffered from two multiplicity defects. First, the three counts of major fraud were multiplicitous because each of his three disbursement requests to OPIC was charged separately rather than as a single fraudulent scheme. Second, two of the false statement counts were multiplicitous because the two statements were made in the same document and therefore should have been charged as a single count. We take each claim in turn.

1.

Doost was charged with three counts of major fraud corresponding to the $7 million disbursement request made in April 2010, the $7 million disbursement request in July 2010, and the $1.8 million disbursement request in November 2010. Each disbursement request was treated as a separate violation

of Section 2(a) of the Major Fraud Act. Pub. L. No. 100-700, § 2(a), 102 Stat. 4631, 4631 (codified as amended at 18 U.S.C. § 1031(a), (a)(2)). That provision makes it a crime to "knowingly execute[] … any scheme or artifice with the intent … (1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises" in connection with a "grant, contract, subcontract, subsidy, [or] loan" with or from the United States if the value of the underlying grant, loan, or contract is $1,000,000 or more. 18 U.S.C. § 1031(a). Doost argues that entering into the loan agreement constituted a single fraudulent scheme and should have been charged as a single violation of the Major Fraud Act, so it was ineffective assistance to fail to challenge the counts as multiplicitous.

In examining claims of multiplicitous indictments, this court first determines what offense Congress made "the unit of prosecution," for instance, whether the statute treats the whole fraudulent scheme as the unit of prosecution or every act within that scheme. *Bell v. United States*, 349 U.S. 81, 83 (1955); *see also Weathers I*, 186 F.3d at 952. While we have not previously determined the unit of prosecution under the Major Fraud Act, we agree with the district court that the appropriate unit of prosecution is an "execution" of a fraudulent scheme. *See Doost*, 2019 WL 1560114, at *8–9. The statutory language criminalizes the "execut[ion]" or the "attempt[ed] … execut[ion]" of the fraudulent scheme, not the scheme itself.[3] Moreover, we have similarly held that the nearly identical language in "[t]he bank fraud statute makes each 'execution' of a fraudulent scheme punishable as a

---

[3] Other circuits also have interpreted the Major Fraud Act to treat each "execution" of the fraudulent scheme as the unit of prosecution. *See, e.g.*, *United States v. Sain*, 141 F.3d 463, 473 (3d Cir. 1998) ("By its plain language, the statute criminalizes each knowing '*execution*' of the fraudulent scheme.").

separate count."[4] *United States v. Bruce*, 89 F.3d 886, 889 (D.C. Cir. 1996); *see also United States v. Reitmeyer*, 356 F.3d 1313, 1321 n.10 (10th Cir. 2004) (citing the court's parallel interpretations of the bank fraud statute and the Major Fraud Act); *United States v. Sain*, 141 F.3d 463, 473 (3d Cir. 1998) (same). Absent some contrary indication, we presume identical terms found in similar statutes should be interpreted similarly.

"Not every act in furtherance of [the fraud] is a separate 'execution' of the scheme," so our task is to distinguish between non-chargeable acts *in furtherance* of the fraud, and chargeable *executions* of the fraud. *Sain*, 141 F.3d at 473; *see also Bruce*, 89 F.3d at 889 ("[A]cts in furtherance of the scheme cannot be charged as separate counts unless they constitute separate executions of the scheme."). Three factors weigh in favor of finding that each request for a disbursement of the loan proceeds was a separate execution of Doost's fraudulent scheme.

First, we consider whether an identifiable sum of money can be traced to a specific fraudulent transaction. *See United States v. Gallant*, 537 F.3d 1202, 1226 (10th Cir. 2008). If so, "there is likely to be a separate execution of the scheme to defraud." *United States v. Brandon*, 17 F.3d 409, 422 (1st Cir. 1994); *see also Sain*, 141 F.3d at 473 (finding separate charges for each fraudulent claim submitted pursuant to a scheme were not multiplicitous "because each sought to obtain a separate amount of money from the government"). This case easily

---

[4] *See* 18 U.S.C. § 1344 (punishing "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain [money or property of] a financial institution, by means of false or fraudulent pretenses, representations, or promises"). The only difference between the two statutes is that the Major Fraud Act includes an intent element. We see no reason why the intent element should affect the unit-of-prosecution analysis, and the parties do not argue otherwise.

meets that criterion, as the indictment identifies the sums of money that Doost requested in each of the three disbursements.

Second, we ask whether each charge involved the violation of "a new and independent obligation to be truthful." *United States v. Molinaro*, 11 F.3d 853, 860 n.16 (9th Cir. 1993). Here, each charge did. Every disbursement request required Doost to prepare and submit distinct invoices and progress reports. And each set of reports contained lies and misrepresentations supporting Doost's claims for payment from the government, which militates in favor of charging the disbursement requests separately.

Third, we consider the language of the indictment and whether it "sufficiently describe[s] two [or more] separate and distinct offenses." *Kerrigan v. United States*, 644 F.2d 47, 49 (1st Cir. 1981); *see also United States v. Benoit*, 713 F.3d 1, 17 (10th Cir. 2013); *Bruce*, 89 F.3d at 890. Doost's indictment describes the numerous sets of documents that Doost had to submit prior to each disbursement. It also plainly states that on the three dates when Doost made disbursement requests, he "did knowingly execute and attempt to execute the [fraudulent] scheme." App. 10. In other words, the indictment describes three distinct executions of the scheme.

Based on these considerations, we conclude the decision to charge Doost with three separate executions of a fraudulent scheme was permissible, so trial counsel did not perform ineffectively by failing to lodge a meritless multiplicity challenge to the indictment.

Doost attempts to resist this conclusion by arguing that agreeing to the loan constituted a single execution of the scheme. Relying on *United States v. Lilly*, 983 F.2d 300 (1st Cir. 1992), he maintains that where a defendant has entered into a single loan with a single lender for a single project, multiple misstatements during the course of that lending relationship

constitute a single fraud. But *Lilly* is inapposite because it focused on the repetition of a single misstatement about "a single aspect of the transaction" made to secure a single loan to fund a single purchase. *Id.* at 303. By contrast, Doost submitted different fraudulent documents about many different purchases, engaging in fraud and misrepresentations in three separate disbursement requests made over six months. Doost flouted multiple, independent obligations to tell the truth, and OPIC transferred separate payments of $7 million, $7 million, and $1.8 million, pursuant to his separate misrepresentations.

Doost also repeatedly asserts that the loan agreement was the only execution of the scheme because entering into the loan agreement immediately put OPIC at risk for the entire $15.8 million, thereby fully executing the scheme. But the structure of the loan agreement belies this argument. It contained numerous conditions that Doost had to satisfy prior to receiving the first disbursement. Doost also had to satisfy several other requirements as "conditions precedent to each disbursement." Supplemental Appendix ("Supp. App.") 229 (capitalization altered). These requirements included, for instance, submitting an extensive list of "[f]inancial [s]tatements" and "reports" to OPIC, such as projections of future revenue, progress reports on the Mine, funds available, lists of affiliate transactions, and more. Supp. App. 230, 232. If Doost did not continue to meet these conditions, OPIC could cut off his funding. Thus, although the loan agreement was for $15.8 million, Doost had to meet additional criteria to receive the disbursements, which supports treating the disbursement requests as separate "executions."

In light of the terms of the indictment, the independent obligation for truthfulness that attached to each disbursement request, and the ease of pinpointing amounts of money that changed hands via these disbursements because of Doost's frauds, charging this scheme in three counts was not

multiplicitous. It would have been meritless for Doost's counsel to raise a multiplicity challenge to the major fraud counts and therefore Doost fails to demonstrate ineffective assistance. *See Islam*, 932 F.3d at 964.

2.

Doost also lodges a belated multiplicity challenge to two of the false statement counts. The indictment charged that Doost falsely attested the Mine purchased a $596,000 blockcutter from Gaspari Menotti, when the Mine had made no such purchase. The indictment charged in a separate count that Doost falsely attested two chainsaws bought from the Afghan Stone Company were costs of the Mine, but they did not qualify as reimbursable Mine expenses because another organization had already paid for them. Doost contends that because he made both these statements in the same disbursement request that he submitted to OPIC, they cannot be charged separately, and his counsel was ineffective for not raising a challenge to the indictment on these grounds. Once more, we disagree.

Doost's false statements were charged under an OPIC-specific false statement provision penalizing "[w]hoever knowingly makes any false statement or report … for the purpose of influencing in any way the action of [OPIC] with respect to any … loan[] [or] equity investment, … or any change or extension of any such … loan[] [or] equity investment." Jobs Through Exports Act of 1992, Pub. L. No. 102-549, § 105(b), 106 Stat. 3651, 3653 (codified at 22 U.S.C. § 2197(n)). The unit of prosecution here focuses on transactions, namely false statements or reports made to OPIC with respect to, inter alia, loans. We have previously considered the appropriate unit of prosecution under a substantially similar false statement provision and explained that it "is targeted at fraudulent loan *transactions*, rather than the particular falsehoods used to achieve the illegal transaction." *United States v. Mangieri*, 694 F.2d 1270, 1282

(D.C. Cir. 1982) (cleaned up) (identifying the unit of prosecution under 18 U.S.C. § 1014). Here, Doost made two false statements about two transactions, requesting one payment of $596,000 for the blockcutter and another payment of $821,742 for the chainsaws. OPIC was influenced to take two actions, namely paying distinct, identifiable sums of money for Doost's two purchases. We hold that Doost was properly charged with two counts of making false statements under 22 U.S.C. § 2197(n).

Nonetheless, Doost argues that because his statements were made in a single disbursement request, they should have been charged as a single count in the indictment. He relies on language in *Mangieri* that "the making of a number of false statements to a lending institution in a single document constitutes only one criminal violation." *Id.* at 1281 (cleaned up). In *Mangieri*, however, we explicitly left open "the possibility that under some circumstances multiple misrepresentations [in a single document] might justify separate offenses." *Id.* at 1282. Here, Doost's two false statements corresponded to two separate purchases and resulted in two OPIC disbursements to separate organizations. These circumstances justified charging separate offenses. The facts here are also distinguishable from the transactions in other cases Doost cites, in which multiple false statements in a document resulted in a single payment. *See, e.g.*, *United States v. Sahley*, 526 F.2d 913, 918 (5th Cir. 1976) (finding a multiplicity problem with an indictment that separately charged false statements that "constituted a single transaction"); *see also United States v. Sue*, 586 F.2d 70, 71 (8th Cir. 1978) (per curiam) (following *Sahley*).

Because the false statement counts are not multiplicitous, it would have been meritless for Doost's counsel to file a pretrial motion to consolidate these counts. Doost therefore

fails to establish deficient performance. *See Islam*, 932 F.3d at 964.

B.

Doost next argues counsel was ineffective for failing to object to the timeliness of counts twelve through twenty of the indictment, which charged him with false statements and money laundering. We hold that, regardless of whether certain counts were actually time-barred, counsel reasonably decided that a timeliness challenge was likely to fail and thus did not perform deficiently by failing to raise that challenge.

We note at the outset that Doost did not raise his statute of limitations challenge until after trial. *See Musacchio v. United States*, 136 S. Ct. 709, 716–18 (2016) (explaining that the federal statute of limitations contained in 18 U.S.C. § 3282 is not jurisdictional and can be waived or forfeited). The parties agree that Doost can raise his timeliness challenge now only if good cause—his attorney's ineffective assistance—excuses his failure to raise it earlier. *Doost*, 2019 WL 3344277, at *1; *see also Musacchio*, 136 S. Ct. at 718 (explaining that to the extent plain error review is available when the defendant "fail[ed] to raise [the statute of limitations] at or before trial," it "cannot be a plain error" for the district court not "to enforce an unraised limitations defense").

Ordinarily, the challenged counts in Doost's indictment would be subject to the five-year limitations period for federal crimes. *See* 18 U.S.C. § 3282(a). Much of the conduct alleged in the indictment occurred more than five years before June 7, 2017, the date of the indictment. Timeliness turns on whether the Wartime Suspension of Limitations Act ("WSLA") tolls the limitations period for the counts at issue.

The question of how the WSLA applies in a case such as this one is an issue of first impression in this circuit and one

without a clear answer. As relevant here, the WSLA tolls the limitations period for any offense

> (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, … [or] payment for, … any contract, subcontract, or purchase order which is connected with or related to the prosecution of [a] war or directly connected with or related to [an] authorized use of the Armed Forces.

18 U.S.C. § 3287.

For offenses to which the WSLA applies, the limitations period is tolled "until [five] years after the termination of hostilities." *Id.*

Doost argues that the WSLA does not toll the limitations period for any of the false statement and money laundering counts. The district court held that subclause one does not apply to any of these counts, and neither party challenges that ruling on appeal. Doost argues subclause two does not toll the limitations period for the crimes at issue here because that subclause pertains only to fraudulent transactions involving real or personal property, and Doost claims that cash and loan proceeds are neither because they are intangible. And he contends that tolling under subclause three is not available because his marble mining activities bore no direct relation to the authorized use of military force in Afghanistan, so they are not "connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces." *Id.* § 3287(3).

Even if Doost is correct that certain counts are untimely, that would not be sufficient because "[t]he crux of an ineffective assistance claim is not simply whether trial counsel neglected to press a viable legal argument, but whether counsel's failure to do so was objectively unreasonable under the circumstances." *United States v. Weathers* ("*Weathers II*"), 493 F.3d 229, 234 (D.C. Cir. 2007); *cf. Harrington v. Richter*, 562 U.S. 86, 109 (2011) (explaining that courts may not "insist counsel confirm every aspect of the strategic basis for his or her actions"). We need not resolve the merits of Doost's claim in order to conclude that counsel performed reasonably, and not deficiently, in forgoing a challenge to the timeliness of the indictment.

In this case, Doost's counsel explained that he believed a challenge to the timeliness of the indictment would have failed. Counsel, who had been practicing federal criminal defense law for over fifteen years when Doost's trial began, swore in an affidavit that he was aware of a potential timeliness challenge from the outset, and he prepared to make such a challenge. He then examined the WSLA and determined it would apply to toll the limitations period with respect to all counts. He concluded that because of the continuing hostilities in Afghanistan, the WSLA generally applied, and he further concluded that subclause one tolled the limitations period for the major fraud counts. On this score, counsel had good company: The district court made the same determinations, which Doost contested below but no longer does on appeal. *See Doost*, 2019 WL 1560114, at \*11–12.

Counsel also reasonably determined that the WSLA would toll the other counts because they charge crimes "committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States." 18 U.S.C. § 3287(2). Doost argues that the statutory language "real or personal property" applies only to

tangible property, not to cash, money, or loan proceeds. We need not conclusively adjudicate the merits of this dispute; it is enough to conclude that counsel's reading of the statute, whereby "personal property" includes cash or loan proceeds, was reasonable. *See Weathers II*, 493 F.3d at 234.

OPIC was an agency of the United States that supported "investments by the United States government"—that is, investments of money belonging to the United States. App. 3; *see also* Supp. App. 2–3. Doost committed fraud and made his false statements in connection with a scheme to "acqui[re]" money belonging to the United States, exactly the type of crime covered by the WSLA. 18 U.S.C. § 3287(2). Moreover, in ordinary legal meaning, cash, money, loan proceeds, or other intangibles qualify as "personal property." *See, e.g.*, *Dickman v. Comm'r*, 465 U.S. 330, 337 (1984) ("[T]he right to use money [is] a cognizable interest in personal property."); *Personal Property*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining personal property as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property").

Counsel reasonably thought subclauses one and two tolled the limitations period for all counts, which meant a timeliness challenge would fail. In forgoing the timeliness challenge, counsel was "not required to have a tactical reason" other than the "reasonable appraisal" of the likelihood that the challenge would fail. *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009); *see also Harrington*, 562 U.S. at 110 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight."). Doost cannot show ineffective assistance, so his failure to raise the statute of limitations defense timely cannot be excused.

III.

Doost additionally asserts that counsel performed ineffectively by failing to introduce the entire email exchange from which his false statement conviction in count fifteen arose. He argues that the exchange shows the question he was answering was fundamentally ambiguous, so his answer cannot serve as the predicate for a false statement indictment. We find this claim without merit. Doost correctly notes that "[i]f … a question is 'excessively vague' or 'fundamentally ambiguous,' the answer [to the question] may not, as a matter of law, form the basis of a prosecution for perjury or false statement." *United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir. 2003) (per curiam) (cleaned up). Nothing about the exchange, however, was fundamentally ambiguous.

The indictment charged that in response to an email from OPIC representative John Aldonas, Doost averred "[t]hat there were no affiliate transaction[s] that occurred during the quarter ending September 30, 2010." App. 13. The government charged this as a false statement. The email from Aldonas, which trial counsel did not admit into evidence, but Doost now contends he should have in order to emphasize the ambiguity of the exchange, read as follows:

Adam,[5]

Your attachments look like a forward looking list of 2011 affiliated transactions between [the Mine] and your marble finishing company.

Perhaps I have confused things, but we are looking for you to certify quarterly, along with the quarterly financial statements, whatever affiliated

---

[5] "Adam" is an alternate name that Doost has occasionally used; this email is addressed to Azam Doost.

transactions have taken place in that accounting period, and that they have taken place on an arm[']s-length basis (with the evidence of this being the sales and volume detail along the lines you have just provided for 2011). If it is the case – since for example the marble finishing operation is not yet processing material – then you could simply certify for the quarter ending Sept[ember] 30, 2010, that there were no Affiliated Transactions. That said, I would ask that you carefully read the definition of Affiliated Transactions so you can consider what if any types of transactions might fit the reportable category.

*Doost*, 2019 WL 1560114, at *2 n.1.

There is nothing fundamentally ambiguous about this exchange, nor is there a reasonable probability that the jury would have decided differently had it been aware of Aldonas's email. The email clearly asks Doost to "carefully read the definition of Affiliated Transactions" before certifying that there were none. Aldonas says Doost can "simply certify for the quarter … that there were no Affiliated Transactions," but only "[i]f it is the case" that all transactions "have taken place on an arm[']s-length basis." Determining how a hypothetical jury would have analyzed additional evidence is not a rock-solid endeavor. "It is inherently a speculative exercise," and this court has not prescribed any means of doing it other than using its judgment. *Nwoye*, 824 F.3d at 1139. In our judgment, Doost falls far short of showing a reasonable probability that introducing this email into evidence would have resulted in acquittal of this false statement charge on the basis of ambiguity in the question. The directions the email provided are simply not that complicated.

Moreover, Doost's direct answer undercuts his claims that the directions were ambiguous. He forthrightly replied that

there were no affiliated transactions. In a typical fundamental ambiguity case, the defendant offers an interpretation of the question where, if his interpretation had been correct, his answer would have been truthful. *See, e.g.*, *United States v. Farmer*, 137 F.3d 1265, 1270 (10th Cir. 1998). Doost does not—and could not—explain what question he was purportedly answering truthfully when he claimed there were no affiliated transactions.[6]

In sum, Doost fails to demonstrate a reasonable probability that the exchange leading to this false-statement charge was fundamentally ambiguous or would have been rendered fundamentally ambiguous by the introduction of Aldonas's email. Insofar as Doost raises a freestanding sufficiency of the evidence challenge regarding this false statement conviction, it is similarly without merit. Viewing the evidence presented at trial in the light most favorable to the government, a rational jury "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).

---

[6] Doost relies heavily on *United States v. Jiang* to argue that the court must favorably consider his potential English deficiencies in assessing his ability to understand and truthfully respond to Aldonas's question about affiliated transactions. 476 F.3d 1026 (9th Cir. 2007). But *Jiang* is distinguishable from this case because the only proof of Jiang's verbal false statement was "Agent Spelce's testimony, based largely on Spelce's notes, which were recorded some time after the day of the interview." *Id.* at 1029. The Ninth Circuit found the evidence against Jiang was lacking overall, and it noted merely as one consideration of many that it could not "properly evaluate Jiang's statements without considering the language barrier that existed between Spelce and Jiang." *Id.* at 1030. None of those facts is present here, where the email is direct documentary evidence of Doost's false statement.

Doost also challenges counsel's failure to introduce other evidence, including an audit that supposedly would have shown Doost used OPIC money to purchase equipment as he averred, as well as testimonial evidence corroborating that claim. Neither alleged failure prejudiced Doost.

To establish ineffective assistance with regard to failure to admit exculpatory evidence or failure to object to inculpatory evidence, a defendant must demonstrate "a reasonable probability that the verdict would have been different" had counsel made the specified evidentiary decisions. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). "We consider each of [Doost's] arguments that his trial counsel was ineffective while keeping in mind that the government's case against him was, in a word, overwhelming." *United States v. Udo*, 795 F.3d 24, 30 (D.C. Cir. 2015); *see also Strickland*, 466 U.S. at 695 (Courts "must consider the totality of the evidence before the judge or jury."). Doost fails to show he was prejudiced by any of counsel's supposed tactical errors with regard to the evidence, and even "considering them in the aggregate" does not "change[] the strength of the government's case." *Udo*, 795 F.3d at 33. Much of the evidence Doost wishes had been introduced would have barely dented the government's case, and the witnesses he wishes had been called would also have been susceptible to damaging cross-examination.

We agree with the district court that Doost cannot establish prejudice because the evidence counsel failed to introduce was of such limited probative value that it would not have weakened the government's case. *See Doost*, 2019 WL 1560114, at *4–6; *see also Udo*, 795 F.3d at 30 ("If the defendant fails to demonstrate prejudice, we may affirm the conviction without deciding whether counsel's performance was deficient.").

\* \* \*

Each of Doost's claims of ineffective assistance falters at either the deficient performance stage, the prejudice stage, or both. He thus cannot show good cause for his belated challenges to the indictment, nor does he undermine our confidence in the verdict because of counsel's alleged evidentiary missteps. We affirm his conviction in full.

*So ordered.*